## Greek Catholic Congregation of Olyphant Borough *v.* Wilson Coal Company, Appellant.

Argued January 24, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*J. H. Price,* with him *C. B. Price,* for appellant.

*Walter L. Hill,* of *O'Malley, Hill, Harris & Harris,* for appellee.

OPINION BY MR. JUSTICE MAXEY, March 21, 1938:

Plaintiff filed a bill in equity to restrain the defendant from mining coal in plaintiff's land and to make it pay for 25,472 tons of coal mined and taken by defendant from the property in controversy. Plaintiff uses this land as a cemetery. On February 13, 1896, it bought the surface of a tract of land, 150 feet in width and 436 feet in depth, herein designated as Tract No. 1, from the Hillside Coal and Iron Company (hereinafter called the H. C. & I. Co.). In this grant no coal was included. On November 12, 1930, an additional plot of contiguous land, in area 29.75 acres, was bought for the same purpose. This Tract No. 2 is called the "Additional Cemetery." In this grant coal *was* included. Plaintiff claims that the defendant by mining coal in Tract No. 2 is depriving it of vertical and lateral support of the surface of the land and rendering it all unfit for sepulture. Defendant claims that it has the right to mine this coal.

Samuel Callender was the common source of title of both parties to this suit. He owned in 1828, two hundred and thirty acres of land in the Township of Blakeley. On October 1, 1828, he leased to Thomas Meredith all the land that he "held or was possessed of" in that township except a certain 100 acres, and he recited that "the land leased . . . contains one hundred and thirty acres or thereabouts and the lease is to continue for the term of one hundred years from this day." Samuel Callender still owned the surface and also the reversionary

interest in the coal beneath it expectant upon the lease's termination in 1928.

In 1847 he deeded for $50 to his son, Newell Callender, out of the 130-acre area subject to the Meredith lease, 45 acres and 108 rods of land, excepting and reserving coal and minerals. The tract so granted became known as "the Newell Callender lot." Included in it are Tracts No. 1 and No. 2.

Defendant claims to derive its rights to the coal whose taking out is enjoined, from the heirs of Samuel Callendar. The contention is that the latter died with the reversionary interest in the coal subject to the Meredith lease (which embraced the coal in the Newell Callender lot) *still in him*. *Plaintiff* claims that Samuel Callender by a *subsequent* deed to the same grantee, Newell Callender, dated January 16, 1850, vested all his reversionary rights in the coal in question, in that grantee. This case hinges on an interpretation of that deed. The 1847 deed and the 1850 deed differ from each other only in their reservations, which are, respectively, as follows: 1847 deed: ". . . excepting and reserving all the anthracite coal on, in or under the above described tract, piece or parcel of land"; 1850 deed: ". . . excepting and reserving, all the anthracite coal on, in or under the above described piece, tract or parcel of land *for the space and term of seventy-nine years from this date*" (italics supplied).

The defendant's claim to the coal in question is founded on a lease it obtained in 1931, after the expiration of the Meredith lease, from Emma A. Plummer, a granddaughter of Samuel Callender, the latter having died intestate. It must be conceded that if Samuel Callender died seized of a reversionary interest in the coal in question, the defendant is now lawfully entitled to mine and remove it.

Plaintiff claims that by the 1850 deed this reversionary interest in the coal passed out of Samuel Callender and into Newell Callender. On December 9, 1854, the

latter and his wife conveyed to Emily St. Amand, 36 acres and 39 perches of land (thereafter known as "the Newell Callender cut"), this being a part of the land conveyed to the grantor by the 1850 deed. This deed to Emily St. Amand contained a reservation for 79 years from January 16, 1850, of the coal leased to Thomas Meredith. By an intact line of deeds, title to the same 36 acres and 39 perches of land, which include Tracts No. 1 and No. 2, passed more than a half century ago to the Hillside Coal and Iron Company. This same company acquired the Thomas Meredith 100-year lease of all the coal in these 36 plus acres (in addition to the coal in other contiguous acreage subject to the Meredith lease).

The court below found as facts that the plaintiff is the owner and in possession of the surface of Tract No. 1 and of "the surface and what remains of the underlying strata of coal" in the 29.75 acres of Tract No. 2, that the defendant had mined and removed 25,472 tons of coal from underneath Tract No. 2, which coal belonged to the plaintiff, and that the agreed value per ton for such coal is fifty cents and that the total value of the coal so mined from plaintiff's land amounts to $12,736.

The conclusions of law were that defendant, its agents, servants and employees should be perpetually enjoined from removing any coal from plaintiff's land, and that the plaintiff should be compensated in the sum of $12,736. A decree was entered in accordance with these findings and conclusions. Defendant appealed.

The findings and conclusions are well supported by the record and the law. It is obvious that when executing the 1850 deed to his son, Newell Callender, the grantor was conscious of the fact that 79 years thereafter the lease on the coal in the tract demised would terminate and that by this second deed he intended that the reversionary interest in that coal should pass to the grantee and his heirs. The "severance" which took place when the Meredith lease was executed October 1,

1828, was not a complete severance for all future time. It was a severance of expressly limited duration. It was not a lease of the coal until the coal should be exhausted by mining. The lease did not provide for an absolute divorce of the coal from the surface; it contemplated only a separation for the space of a century. In *Sanderson v. Scranton*, 105 Pa. 469, the lease for coal was expressly made "perpetual until all the coal under the tract is mined." It was held that this constituted such a complete severance that the taxes of the City of Scranton on the coal in place were chargeable to the lessee and not the lessor. So in *Kingsley v. H. C. & I. Co.*, 144 Pa. 613, 23 A. 250, it was held that there was such a severance that occupation of the surface was not an adverse possession even against a lessee who had not opened or entered on actual possession of the coal. In *Denniston v. Haddock*, 200 Pa. 426, 50 A. 197, this court, in an opinion by Justice MITCHELL, said: "With the decisions in these cases no fault can be found, but the expression that a conveyance of coal in place, *even by a lease for a limited term is a sale* [italics supplied], is inaccurate as a general proposition of law, and unfortunate from its tendency to mislead, which is apparent in some of the subsequent cases. Whether it would be better to call such an instrument accurately what it certainly was at common law, a lease without impeachment of waste, or to endeavor to reconcile all the decisions by calling it a conditional sale, is not necessary at present to discuss. The point to be noted is that the rules applicable to sales are not to be applied indiscriminately to such instruments but each is to be construed like any other contract by its own terms." In *Girard Trust Co. v. D. & H. Co.*, 246 Pa. 161, 166, 92 A. 129, this court said: "A contract regarding coal in place may be a sale absolute, a conditional sale, a lease in the ordinary acceptation of that term, or a mere license to mine and remove the minerals" (citing cases).

In making this 1850 deed Samuel Callender evidently contemplated a reuniting of the surface and the mineral estates. In practical effect he, in that deed, said to his son, the grantee: "I give you this entire fee subject, however, to Thomas Meredith's lease of the coal, which still has seventy-nine years to run, unless it is sooner forfeited or terminated." Since plaintiff's title to this coal stems from Newell Callender and since all rights and estates under the Meredith lease absolutely terminated in 1928, plaintiff's right to the coal the defendant mined is unassailable.

Appellant stresses the contention that there are adjudications in prior suits to the effect that the title to the reversion is in the appellant's principal lessor and that an injunction in another suit against the use of certain premises by appellee's predecessor is res adjudicata as to title of the land now in controversy. Appellant refers to two suits, herein designated as the 1902 suit and the 1929 suit, respectively. In both suits Emma A. Plummer was plaintiff and the H. C. & I. Co., appellee's immediate predecessor in title, was defendant. Appellant says: "Title to the coal at issue here, was the real matter involved there." This statement standing alone is misleading. It is true that Emma A. Plummer in the 1902 suit claimed, as against the H. C. & I. Co., the coal now in controversy, that the latter successfully contested the claim not by reason of any rights stemming from Newell Callender but by reason of rights under the Meredith lease which at that time the company owned. Whether or not Samuel Callender in *1850* parted with his reversionary rights in the coal in question was absolutely of no concern to the H. C. & I. Co., in 1902, for it was then asserting and exercising mining rights acquired by Thomas Meredith from Samuel Callender in *1828*. Plaintiff is now asserting rights which Samuel Callender parted with in 1850 and which are unaffected by the *now* legally *non*existent Meredith lease of 1828. In *Plummer v. H. C. & I. Co.,* reported in 29

Lackawanna Jurist 42, the Court of Common Pleas of Lackawanna County, said: "Plaintiff [Emma' A. Plummer] had heretofore been at pains to test the title of Meredith under this grant. . . . In each instance she suffered an adverse judgment, legal title to the coal being adjudged to have been severed and vested in Meredith and his assigns, together with the right to mine and remove it during the appointed term. . . . Indeed it is not now seriously disputed that the Meredith rights were well vested in the Hillside, etc., Co., at and before any mining now in question was done on the Callender." The decree of the Court of Common Pleas was affirmed by the Superior Court in *Plummer v. H. C. & I. Co.*, 96 Pa. Super. Ct. 180. A reading of the opinion of Judge BALDRIGE in the Superior Court report and the opinion of Judge NEWCOMB in the Lackawanna Jurist shows that there is no foundation for the allegation that the legal question *now in controversy* was adjudicated in the proceedings in equity begun in 1902. It is true that in Judge NEWCOMB'S opinion there is a statement that Emma A. Plummer was "seized of title to six-sevenths undivided of the reversion in the underlying coal expectant upon the end of this lease under which defendants are in possession and are carrying on the mining." This statement was pure dictum and was evidently made without any concentration—for none was then necessary—upon the issue presented by the immediate pleadings.

The issue in the 1929 suit was wholly foreign to the issue here. The bill in that case alleged that the H. C. & I. Co. had become vested with title to the lease of 1828 and had mined and removed coal from the land therein described and had built railroads and other improvements on Emma A. Plummer's land, that the lease had expired, and that they are "mining coal on adjoining land and transporting the coal over the land of the plaintiff" (i. e., Plummer). The injunction restrained them from transporting coal over plaintiff's lands as

described and from removing railroads, railroad rails and other improvements. The railroads and other improvements were *not* on the Newell Callender lot. Whatever rights the court in that decree protected were admittedly Emma A. Plummer's and there is no factual support for the contention that "plaintiff's land" as used in *that* case meant the coal in controversy in *this* case.

Appellant also seeks to find support for the position it takes, from certain alleged admissions in the pleadings of the H. C. & I. Co., in the 1902 suit, above referred to. Appellant says in that suit the H. C. & I. Co. "claimed ownership of the Meredith lease only" and that "it was not disputed on the part of the company or other defendants that Emma A. Plummer was the owner of the reversion in the coal expectant upon the termination of the lease." The answer is that the H. C. & I. Co. was then under no obligation to challenge Emma A. Plummer's title to this reversion. It was mining coal under the Meredith lease by virtue of which it had exclusive possession of the coal in controversy and it had no concern *at that time* as to who would succeed to the ownership of the coal upon the determination of the Meredith lease. Defendant also invoked an admission in the answer made by the H. C. & I. Co. in the 1929 suit that it "ceased to have any interest in the premises described in the agreement referred to . . . after the 1st day of October, 1928, said agreement [the Meredith lease] having by its terms, expired on that date." That company did not by any such admission divest itself of any legal rights it had stemming from Newell Callender or preclude itself or its successors in title from maintaining those rights in any subsequent proceeding.

Courts will not, in proceedings where specific legal rights are in issue, make a requested divestiture of them on careless or inadvertent admissions found in the records of actions where such legal rights were not in controversy. In *Lindsay v. Dutton,* 227 Pa. 208, 75 A. 1096,

this court held that the pleadings in a prior equity suit between the same parties are admissible as admissions to contradict their evidence in the case on trial, or to affect their credibility; but they are not to be taken as estopping the parties, against whom they are offered, from taking a different position in the case on the law side of the court. In *Gibson v. Rowland,* 35 Pa. Super. Ct. 158, that court said that where a case is stated to procure the judgment of a court on certain facts sub-- mitted, effect is not to be given to it beyond those facts, and certainly not to compromise a title springing from a different condition of things, and that pleadings are conclusive in their nature, but that effect is confined to the cause in which they are made, and that when used in other causes as ordinary admissions, they are of course not conclusive. Wigmore on Evidence, 2nd ed., Vol. 2, sec. 1066, page 547, says: "The use here discussed, of informal and quasi-admissions, has nothing to do with the use of *pleadings as. solemn or judicial admissions.* The latter are conclusive in their nature; but that effect is confined to the cause in which they are made. When used in other causes as ordinary admissions, they are of course *not conclusive."*

Defendant also contends that the bill should have been dismissed because no irreparable damage was shown and there was an adequate remedy at law in a suit for damages. This contention must be rejected. There is no situation more appropriate for the interposition of a court of equity by injunction than that presented by the record now before us where the soil set apart for the interment of the dead is disturbed and caved in and threatened with a continuance of such desecration by those who, without legal warrant and for purposes of pecuniary profit, unlawfully enter the subjacent strata and mine and remove the supporting minerals.

The decree is affirmed, at appellant's cost.