### Allegheny Beverage Corporation v. Conel Corporation

*David L. Pennington* and *Walter M. Dinda,* for plaintiff.

*Robert H. Malis,* for defendants.

CODY, J., December 10, 1971.—Defendants in the above-captioned suits, Conel Corporation (Conel), Harold Yoskin, and Ernest Blumenthal, filed motions for summary judgment in their favor, in accordance with the provisions of Pennsylvania Rule of Civil Procedure 1035(a) and (b); and the corporate defendant moved for summary judgment in its favor on its counterclaims against the two plaintiffs, Associated Royal Crown Bottling Company (Royal Crown) and Allegheny Beverage Corporation (Allegheny). Defendants, in support of their motions for summary judgment, rely on the pleadings themselves, the lengthy oral depositions taken by both sides of the controversy, and certain affidavits which have been filed, which, taken together, defendants maintain demonstrate conclusively that there is no genuine issue of fact requiring a trial. We were constrained to agree, and, accordingly, entered the orders from which plaintiffs have appealed.

We have approached the problem with certain well-established principles in mind: That the function of summary judgment procedure, both under our rule 1035 and under its parent Federal rule 56, is not to try disputed facts but to determine whether there are genuine issues of material fact to be tried; that defen-

dants have the burden of showing by affidavits, depositions, discovery or other supplementary procedures, that there is no issue on which plaintiffs have a right to trial, and that the affirmative defenses pleaded are conclusive: Ruhe v. Kroger Company, 425 Pa. 213 (1967), and the numerous decisions of the Federal courts under rule 56; and that where allegations of fact in a pleading are based on the interpretation of documents attached as exhibits and the documents themselves do not warrant the allegations, the allegations may be disregarded as mere legal conclusions: Greek Catholic Congregation v. Plummer, 338 Pa. 373 (1940).

The depositions supplied are those taken by plaintiffs of Alfred H. Juechter, President of Royal Crown at the time of the transaction in suit; Martin D. Kamison, at that time President of Porto Rico Beverage Company, Inc. (Porto Rico); Norman Spector and Ernest Blumenthal, accountants employed by the firm of Laventhol, Krekstein, Horwath; and those taken by defendants of Morton M. Lapides, President of Allegheny; and Charles M. Cohen, now deceased, who was, at the time of the transaction, Secretary of Royal Crown and who later became its president. Plaintiffs also supplied an affidavit of Joseph I. Abramson, Vice President of Allegheny; and defendants filed affidavits of Alfred H. Juechter and of Harold Yoskin, Chairman of the Board of Directors of Conel.

These two actions, one in trespass brought by Royal Crown, the other in equity brought by Allegheny, have identical factual bases. They were indeed both filed on the same day, and though the two plaintiffs are represented by different counsel, the wording of the two complaints is, for the most part, identical. Each complaint has attached to it the same exhibits, and each recites that by an agreement dated August 7, 1969,

Conel sold to Royal Crown all the issued and outstanding stock of Porto Rico for an agreed price of $542,007.43, consisting of a cash payment of $102,007.43 and Royal Crown's note for $440,000. There is no question that at the signing of the agreement of sale Conel delivered to the purchaser, Royal Crown, the stock of Porto Rico and that Royal Crown made the required cash payment and delivered to Conel its judgment note for $440,000, payable in one year, with interest at the rate of seven and one-half percent per year; nor is there any question that, simultaneously, Allegheny, plaintiff in the equity action, executed an agreement to be surety for and guarantee the obligations of Royal Crown under the note and the contract.

In its trespass action, Royal Crown charged that Conel and its officers, the individual defendants, (a) willfully and deliberately misrepresented the financial condition of Porto Rico, (b) misrepresented the obligation of Porto Rico under the lease agreement with the Tioga Company, and (c) deliberately and willfully failed to advise Royal Crown of the provisions of labor agreements as required by the purchase agreement, and seeks substantial compensatory and punitive damages because of defendants' "willful, deliberate and fraudulent misrepresentations."

Allegheny, in its equity action, makes the same charge as that of Royal Crown in clause (a) of the above paragraph, and seeks rescission of its surety agreement and an award of compensatory and punitive damages.

Each of the complaints under consideration contains a further averment, that "Defendants and each of them made other deliberate and willful misrepresentations . . . as shall be shown at trial." Such averments fall far short of the requirements of rule

1019(b). "Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation nor offered simply to harass the opposing party and to delay the pleader's own obligations. For this reason our rules require that fraud in either a complaint or reply must be 'averred with particularity' . . . The pleadings must adequately explain the nature of the claim to the opposing party so as to permit him to prepare a defense and they must be sufficient to convince the court that the averments are not merely subterfuge": Bata v. Central-Penn National Bank of Philadelphia, 423 Pa. 373, 379, 380 (1966).

We direct our attention first to the averment contained in paragraph 16 of Royal Crown's complaint in trespass, that "Defendants and each of them misrepresented the obligation of Porto Rico Beverage Company under the lease agreement with the Tioga Company."

Nowhere in the lengthy exhibits or in the evidentiary documents is there any reference to a lease agreement to which Porto Rico is a party. The contract for the sale of the Porto Rico stock is attached to the complaint, with numerous schedules and exhibits forming part of the contract. One of these is a lease agreement between Tioga Company as owner and Conel as tenant of a building located at Tulip and Tioga Streets in Philadelphia, into which it was planned that Porto Rico was to move its operations following Porto Rico's acquisition by Royal Crown and the sale of the premises formerly owned and occupied by Porto Rico at 1918-22 Germantown Avenue. This lease, which was for a term of 10 years commencing January 14, 1969, was, as part of the contract for the sale of the Porto Rico stock, assigned by Conel to Royal Crown; the assignment was accepted by Royal Crown, and Allegheny became surety to the owner and guaranteed

Royal Crown's obligations as tenant under the lease. This assignment was duly and formally accepted by Tioga Company, the owner.*

This lease contained a provision giving the tenant an option to purchase the premises on May 15, 1976, for a purchase price of $400,000, which the principal officers of both Royal Crown and Allegheny state in their depositions they regarded as a favorable price. The thrust of their complaint in this respect is that when in the fall of 1969, a few months after Royal Crown had become the tenant, Royal Crown attempted to purchase the building, they assert that they were informed by the owner, Tioga Company, that they had no option. It is true that Royal Crown had no option under the lease which could be exercised at that time, since the lease provided for an option exercisable on May 15, 1976, some years later. It is true also that the option to purchase contained in the lease is conditioned by the provision "that tenant shall not have been in default hereunder," but nothing appears in the depositions or any other documents to indicate a default under the lease and the contrary is indicated by exhibit B to the Yoskin affidavit, which is a letter dated August 7, 1969, from Conel to Tioga Company, formally accepted by Tioga Company, by which Conel agreed to pay, and Tioga Company agreed to accept, an additional $300 per month during the remaining term of the lease as the consideration for Tioga Company's agreement to the assignment. This agreement is cited in schedule D of the contract, "Events or

---

*The owner's consent to the assignment, perhaps inadvertently, was not attached as an exhibit to the contract or the complaint in trespass, although it is listed, with the assignment itself, in item II—4 of schedule T as one of the documents to be delivered at the closing. It has, however, been supplied as exhibit A to the affidavit of Harold Yoskin filed June 23, 1971.

Conditions Adversely Affecting the Company," wherein Conel agrees to indemnify and hold harmless Royal Crown against any liability or claim of liability thereunder.

This question of the obligations under the lease may well have become moot, since counsel for Royal Crown at the argument on the motion for summary judgment informed the court that Royal Crown has now entered into an agreement to purchase the building. In any event, it appears obvious from the exhibits to the complaint and the evidentiary material supplied that there is no factual basis on which plaintiffs can legitimately found a charge of fraud or misrepresentation against defendants.

Much has been said in the briefs and arguments and in the evidentiary material regarding plaintiffs' contention that Conel at the time of the contract's being prepared and executed failed to disclose an agreement between Conel and Albert J. Grosser Company providing for payment of a commission to the latter, a real estate broker. This matter was not mentioned in either of the complaints, though possibly plaintiffs may have regarded it as included in the allegation of paragraph 16 of the complaint in trespass, that defendants misrepresented the obligation of Porto Rico under the lease agreement with the Tioga Company. Plaintiffs have attached to one of their briefs a copy of a letter agreement dated January 15, 1969, between Conel and the Grosser Company in which Conel agrees to pay a commission of $1,625 per year during the term of the lease between Conel and the Tioga Company and a commission of $10,000 in the event of Conel's exercising its option to purchase the leased premises.

The commission would not be an obligation of Porto Rico but an obligation of Conel, which was a

party to the lease. Since the lease was, as a part of the principal contract deal, being assigned by Conel to Royal Crown, it is reasonable to expect that the existence of a commission obligation would be disclosed. For a number of reasons we are convinced that the exhibits to the complaint and the evidentiary material before us show that it was.

(1) Schedule J of the contract, which is titled "Contracts and Agreements (Except Employment Contracts)," contains two references to Albert J. Grosser Co. Item 2 of this schedule reads, "Albert J. Grosser Co.—Agency Agreement re: Sale of Germantown Ave. Properties," and attached is a letter dated January 24, 1969, from Conel to the Grosser company, stating the terms of Conel's employment of Grosser as agent for the leasing and sale of Porto Rico's Germantown Avenue real estate. Item 3 of the same schedule as originally typewritten read, "Albert J. Grosser Co.—Commission—re: Lease or Sale Germantown Ave. Properties," but at the time of the closing on August 7, 1969, the last five words, "or Sale Germantown Ave. Properties," were crossed out and other words were written in, so that the item then read, "Albert J. Grosser Co.—Commission—re: Lease of Space Tulip & Tioga Bldg. and on Sale of Building—2½% Commission." This and other alterations and interlineations, it is admitted, were made at the time of the signing of the contract after discussion among the principals and their attorneys. It is apparent that item 3 was intended to refer to the Tulip and Tioga property rather than to the Germantown Avenue property, and that the parties at the time of the closing were aware of the existence of a commission agreement with the Grosser company on the Tulip and Tioga building.

(2) The lease itself, in paragraph 32, contains a provision that the tenant shall pay all commissions due

to any party excepting B. Kevin Hart & Associates, Inc. (the landlord's agent), and a warranty by the landlord that it has dealt with no brokers in connection with the lease other than the Hart firm and Albert J. Grosser Co.

(3) The then secretary and later president of Royal Crown has acknowledged in his deposition that he had read the lease before the closing.

(4) After the closing and for several months Royal Crown continued to pay to Grosser the monthly installments set forth in the letter agreement of January 15, 1969.

(5) In his affidavit filed June 22, 1971, Alfred H. Juechter, president of Royal Crown at the time of the closing, stated, "With respect to the commission due Grosser, this was thoroughly discussed at settlement and the typewritten agreement was amended in ink at the time of closing by both Messrs. Cohen and Kitt to correct an error with respect thereto."

The averment of paragraph 17 of Royal Crown's complaint in trespass is that "Defendants, and each of them, deliberately and wilfully failed to advise plaintiff of the provisions of labor agreements as required by the purchase agreement."

Plaintiffs' complaint in this respect is that although at the time of the closing Porto Rico had no collective bargaining agreement with its unionized employes, the contract having expired in the spring of 1969 and a renewal being then in course of negotiation, when in the early part of 1970 the officials of Royal Crown and Porto Rico arrived at a new agreement with the union, certain provisions were by the new agreement made retroactive from April of 1969.

No finding of fraudulent misrepresentation could be founded on this factual basis. Conel warranted in the contract of sale that "The Company (Porto Rico)

is not a party to any contract or agreement which has not been disclosed on schedule J." Porto Rico was not, at the time, a party to any collective bargaining agreement. Moreover, as is disclosed in the depositions and in the affidavit of Mr. Juechter, the Royal Crown management knew that a new contract was under negotiation. Indeed, that management actively participated in the negotiations, and the agreement was finalized by them with the union more than a half a year after Conel's connection with Porto Rico had ceased.

These matters of the labor contract and the others that have been discussed have been so thoroughly explored in the depositions and affidavits as to leave no genuine issue of fact to be resolved at a trial. They lack substantiality and at best they appear to be makeweights in an effort by plaintiffs to give a greater appearance to their prime complaint, the charge that the defendants fraudulently misrepresented the financial position of the Porto Rico Beverage Company. That is the chief thrust of their suits, without which, as plaintiffs' officers have indicated in their depositions, these actions would not have been brought.

The averments of Royal Crown's complaint in trespass and Allegheny's complaint in equity, in paragraph 10 of the former and paragraph 11 of the latter, are identical: "On August 7, 1969 defendants and each of them warranted and represented to plaintiff that the financial condition of Porto Rico Beverage Co., Inc. was as of the time of settlement, August 7, 1969, substantially as reflected in the financial statements attached as Schedule C attached to Exhibit 'A' and that there were no events or conditions adversely affecting the company as of settlement date, in accordance with Schedule D attached to Exhibit 'A', a true and correct copy of which is attached to this pleading."

This is not a precisely correct statement of Conel's

warranty in this respect. The contract, which is attached to the complaint as exhibit "A," sets forth, in section II, "Representations and Warranties of Seller," under which heading, on page 3, appears the following:

"F. The balance sheet of the Company (Porto Rico) at May 31, 1969 and the related statements of retained income deficit and income of the Company for the 5 month period ended May 31, 1969 certified in an unqualified opinion, by the Company's Certified Public Accountants, Laventhol, Krekstein and Horwath, (attached hereto and a part hereof as Schedule C), fairly present, in accordance with generally accepted accounting principles applied on a basis consistent with that of the preceding year, the financial condition and the results of operations of the Company as at the date thereof, and for the period indicated."

And, on the same page, appears subparagraph H of section II of the contract, which, in pertinent part, reads:

"H. Except as set forth in Schedule D, which is attached hereto and made a part hereof, there has not been: (1) any material adverse change in the financial condition or in the operations of the business of the Company from that shown on the Financial Statements referred to in Section II F of this Agreement, . . . (6) any other event or condition of any character pertaining to and materially and adversely affecting or threatening the assets or business of the Company."

Schedule D of the contract lists no "Events or Conditions Adversely Affecting the Company" except a possible claim by Tioga Company against Conel, which does not involve Porto Rico and which has already been referred to in our discussion of the assignment of the lease for the Tulip and Tioga premises.

Adverting again to the complaints, plaintiffs aver that the financial results of the operations of Porto Rico and defendants' representations and warranties in respect thereto were a material consideration in the setting of the purchase price of the Porto Rico stock. The statement of income (Loss) and deficit for the five months ended May 31, 1969, attached to the contract as a part of schedule C shows a net loss of $3,642, which includes an item of interest expense of $698. Total net sales for that period were reported as $543,537. Plaintiffs then aver that in its financial statement for the full year ending December 31, 1969, which is attached as exhibit B to the complaints, Conel reported that the operations of Porto Rico through August 7, 1969, the date of the sale of the Porto Rico stock, had resulted in a loss of $34,229.

The difference in operating results between a loss of $3,642 in five months and a loss of $34,229 in little more than seven months may be regarded as substantial, and, if the figures were truly comparable, might be an indication either that the first five months' operating results had been incorrectly reported, or that during the following two months and seven days some "event or condition" had arisen which adversely affected the business. But, are they comparable? Or is the fact that the first figure represents the results of the operation of Porto Rico itself and that the latter figure does not represent a Porto Rico loss but a loss suffered by Conel by reason of its ownership of the shares of Porto Rico? The financial statements, the depositions, and the exhibits produced by the accountants clearly show that the latter is the true explanation.

Early in 1970, the accounts of Conel were audited by the accounting firm of Laventhol, Krekstein, Horwath and Horwath. Norman Spector, who had been

assigned as the in-charge accountant on this audit, was deposed by plaintiffs and examined at great length. Mr. Spector's testimony and the documents which he supplied, which have been submitted as exhibits to his deposition, show clearly the origin and nature of the ingredients, totaling $493,208, of the item appearing in Conel's statement of income (Loss) and deficit for the year ended December 31, 1969, entitled "Loss from discontinued operations." During the year Conel sold the capital stock of two of its subsidiaries, Electronics Division and Porto Rico. We need not concern ourselves with the Electronics Division. In a note to its financial statements Conel stated: "On August 7, 1969, the Company sold the capital stock of Porto Rico Beverage Company, Inc. for $102,000 in cash and 7½% note due August 7, 1970, in the amount of $440,000. This company sustained operating losses of $537 in 1968 and $34,229 in 1969 to the date of sale. The loss from discontinued operations in 1969 is summarized below:

| | Electronics Division | Porto Rico | Total |
|---|---|---|---|
| "Loss from operations | $350,536 | $34,229 | $384,765 |
| "Loss on sale of investment | 100,412 | 8,031 | 108,443 |
| | $450,948 | $42,260 | $493,208" |

This "loss from discontinued operations" is Conel's loss, not Porto Rico's. The "loss on sale of investment" of $8,031 was arrived at by adding three items of Conel expense in the sale of Porto Rico to Royal Crown, consisting of a real estate commission of $5,400, fees paid to Blank, Rome, Klaus & Comisky of $11,000, and a fee paid to Wolf, Block, Schorr & Solis-Cohen of $3,500, totaling $19,900, and subtracting therefrom $11,869, Conel's gain on the sale of the Porto Rico stock to Royal Crown.

The derivation of the figure of $34,229 is equally discernible from the evidentiary material at hand. Before analyzing it, we should note that the figure $34,229 given in the Conel annual report should be increased by $3,430. In calculating the Conel expenses allocable to the discontinued operations, an item of $3,430.27 of interest earned by the Electronics Division was inadvertently allocated to Porto Rico. This error was not discovered before the report was issued. The effect of its correction is to decrease the loss allocable to Electronics and increase the loss allocable to Porto Rico accordingly. To avoid confusion, however, it appears preferable to continue to use the $34,229 figure, since that is the figure stated in plaintiffs' pleadings. In either event, only a comparatively minor portion of the total loss can be said to be Porto Rico's. The breakdown shown by the accountants' figures is as follows.

Of the total rental expense borne by Conel for the Tulip and Tioga building, the amount allocated to Porto Rico's occupancy was ......................... $9,086.02

From this was deducted rent which Conel received, amounting to .............. 6,305.85

Leaving a balance of rent expense of .. $2,780.17
Conel paid interest to Girard Bank on money which it had borrowed in order to purchase Porto Rico's predecessor company, totaling ..................... 21,266.88
Conel was put to additional expense in connection with the rented Tulip & Tioga building amounting to .............. 2,726.73

These expenses total .............. $26,773.78
From which should be deducted the item of $3,430.27 of interest earned by Electronics but erroneously applied to Porto Rico ............................. 3,430.27

418

Leaving a net total figure used by Conel in figuring its loss from discontinued operations of .......................... $23,343.51
To this the accountants added the figure that had been reported to them as the operating loss of Porto Rico for the period from January 1, 1969, to August 7, 1969 of .......................... $10,884.80
Giving a total loss to Conel from the discontinued operation of Porto Rico of .. $34,228.71

Which for the purpose of the Conel annual report was rounded off to $34,229.

The figure of $10,884.80 (rounded off to $10,885) thus appears to have been accepted as representing the operating loss of Porto Rico for the seven months and seven days ending August 7, 1969. This figure is not the result of any formal audit, because none was made at the date of the contract's execution, but it is derived from a statement prepared by Thomas Donovan, who had been an employe of Royal Crown and became controller of Porto Rico after that company was acquired by Royal Crown. This statement, entitled "Pro-Forma Consolidated Statement of Income, Associated Royal Crown," lists, in three parallel columns, the operating income and expenses of Consolidated A.R.C. 7/31/69, Porto Rico Bev. Co. thru 8/8/69, and Consolidated Pro Forma @ 7/31/68 (sic), the third column figures being the totals of the first two columns. This statement shows a net "income before taxes" for Porto Rico through 8/8/69 of $10,884.80. That figure, though contained in a tabulation marked "pro forma," appears to be the only available source of information regarding the results of Porto Rico's operations between May 31, 1969, and August 7, 1969. In any event, it was the figure accepted and used by the auditors in calculating Conel's cost base for Porto

Rico and Conel's loss incident to its discontinued operation of Porto Rico.

Counsel for plaintiffs, orally and in their briefs, have argued that even this loss, apparently indicating an acceleration of Porto Rico's losses during that two-months period, points to the existence of some untoward event or condition which Conel failed to disclose. Particularly so, they argue, since a loss is to be expected in the beverage business during the first five months of the year, but the months of July and August are the season of the year when operations are normally most profitable. We cannot accept this theory. It must be conceded that during the period in question, Porto Rico was in the course of moving its entire operation from the Germantown Avenue plant to its new quarters at Tulip & Tioga, where Royal Crown planned to consolidate it with Royal Crown's other operations. Even so, the figures are not alarming. The depreciation included in the May 31st statement amounted to $7,034 and, according to the accountants' note, included no depreciation on leasehold assets, whereas in the August 8, 1969, pro forma statement the depreciation figure was $9,704.83. Moreover, a calculation of the ratio between total sales volume and net operating loss shows results not unduly out of line. Porto Rico's net sales for the five months ended May 31st were $543,537, and in the pro forma statement of August 8, 1969, they amounted to $804,101.99. The net income before taxes in the latter case was 1.35 percent of the total net sales; in the former case it was .67 percent of the net sales. Interestingly, but perhaps irrelevantly, the pro forma statement reflects that the net loss figure for Royal Crown was 40 percent of the total net sales for the seven-months period ending July 31, 1969.

We could arrive at no other conclusion than that

plaintiff's assertions of fraud on defendants' part are entirely without foundation, that there is no further issue of fact to be developed at a trial, and that the court would have no choice, in the event of a trial, but to direct a finding in defendants' favor.

It is clear, from the depositions, that Royal Crown's chief concern at the outset was to obtain a building suitably equipped for bottling operations, which Allegheny required Royal Crown to acquire in order to function under a franchise arrangement between the two companies; that Allegheny's executive officer was the controlling figure in the deal and was fully aware that Conel was under heavy expense in the financing of the purchase of Porto Rico from its previous owners, and that he firmly stated that he would not agree to any deal for a payment which included such expense. What Allegheny and Royal Crown wanted was Conel's building and Porto Rico's equipment; Porto Rico's operations under Conel's ownership were secondary.

Clearly, they got what they wanted and what they bargained for. They have advanced no valid reason and, as we view the case, can advance none, why they should not pay the agreed price.