2024 PA Super 154

| | | |
|---|---|---|
| CEDARBROOK PLAZA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALEX SCHWARTZ, INDIVIDUALLY | : | |
| AND D/B/A ALL-STATE INSURANCE | : | |
| | : | No. 1437 EDA 2023 |
| Appellant | : | |

Appeal from the Order Entered April 18, 2023
In the Court of Common Pleas of Montgomery County
Civil Division at No:  2021-02929

BEFORE:  BOWES, J., STABILE, J., and LANE, J.

OPINION BY STABILE, J.:                                    **FILED JULY 23, 2024**

Alex Schwartz, individually and d/b/a All-State Insurance ("Tenant") appeals from the April 18, 2023 order granting summary judgment, in part, in favor of Cedarbrook Plaza ("Landlord") in this commercial lease case.  Upon review, we affirm.

The parties stipulated to the following facts:

1. On or about September 9, 2019 the parties entered into a lease agreement for the premises commonly known as Space No. 209 within Cedarbrook Plaza, a shopping center situated at Cheltenham Avenue and Easton Road in the Township of Cheltenham, County of Montgomery, Commonwealth of Pennsylvania (hereinafter referred to as the "Leased Premises").

2. The term of the lease agreement executed by the parties was one (1) year ending October 31, 2020.

3. Pursuant to the terms of the Lease Agreement, [Tenant] was required to pay [Landlord] a monthly rent of Four Thousand ($4,000.00) Dollars per month.

4. Pursuant to the terms of the lease, [Tenant] was required to pay [Landlord] a monthly charge for electric usage to be billed at the conclusion of each month and due with the next month's rent.

5. [Tenant] paid to [Landlord] all rent charges from the inception of the lease up to and including the rental payment due March 1, 2020.

6. [Tenant] paid to [Landlord] all electric charges from the inception of the lease until and including February 2020.

7. [Tenant] complied with all other lease terms from the inception of the lease until March 2020.

8. The Governor of the Commonwealth of Pennsylvania issued a disaster proclamation in response to the worldwide COVID- 19 pandemic whereby, in pertinent part, all non-essential businesses were ordered to cease in-person operations until further notice effective March 19, 2020 with enforcement of the same to begin March 21, 2020.

9. As part of the Governor's disaster proclamation, his office issued a list of businesses that were deemed to be essential and non-essential.

10. [Tenant]'s business was defined as non-essential pursuant to the Governor's proclamation and accompanying documents.

11. The Governor's proclamation regarding the ceasing of in-person operations of non-life sustaining businesses was lifted by amendment effective June 4, 2020, pursuant to the terms of the Governor's COVID-19 phased reopening.

12. Montgomery County, wherein the Leased Premises is located, permitted businesses to begin partial in-person operations beginning June 5, 2020, as the County entered the "Yellow Phase" pursuant to the Commonwealth of Pennsylvania's phased reopening plan while full in-person operations were permitted as of June 26, 2020 as the County entered the "Green Phase" pursuant to the Commonwealth of Pennsylvania's phased reopening plan.

13. [Tenant] did not operate his business within the Leased Premises from March 6, 2020 until the lease terminated in October 2020.

14. [Tenant] did not pay rent or electric charges for the period of March 2020 until the lease terminated in October 2020.

15. Following the Governor's lifting of the business closure order, beginning June 5, 2020, [Tenant] was permitted to resume in-person operations of his business within the Lease[d] Premises.

16. Despite the Governor's lifting of the business closure order, [Tenant] did not resume in-person operations of his business within the Leased Premises.

17. [Tenant] did not pay rent or electric to [Landlord] for the period of March 2020 through the end of the lease.

18. Following [Tenant]'s decision to cease paying rent, [Landlord] began seeking a new tenant for Space No. 209 within Cedarbrook Plaza by using common real estate mark[et]ing techniques including but not limited to online advertising in forums that market real estate and offering to show the property to prospective tenants.

19. Unpaid rent for the Leased Premises totals $28,000 and unpaid utility bills total[s] $863.49.

20. The lease agreement between the parties permits [Landlord] to pursue [Tenant] for attorney's fees if the lease is breached.

21. The parties stipulate to the authenticity and accuracy of the lease agreement and account ledger attached to [Landlord]'s Complaint.

22. The parties consent to the entry of the lease agreement and account ledger attached to [Landlord]'s Complaint into the record.

Stipulation, 12/15/22.

On March 9, 2021, Landlord filed a breach of contract complaint against Tenant, seeking unpaid rent and electric charges from March 6, 2020, when Tenant vacated the Leased Premises, to the end of the lease term in October 2020, as well as attorney's fees. Tenant filed an Answer and New Matter,

asserting that his performance was excused by the doctrine of frustration of purpose. On August 11, 2022, an arbitration panel awarded Landlord damages in the amount of $16,000.00.[1] Tenant filed a notice of appeal to the Court of Common Pleas of Montgomery County.

On December 15, 2022, the parties filed the stipulation of facts set forth above. On December 16, 2022, the parties cross-filed motions for summary judgment. Landlord sought total damages of $36,079.36 ($28,000.00 in unpaid rent, $863.49 in unpaid utilities, and $7,215.87 in attorney's fees). Tenant sought to excuse his performance, i.e. paying rent and utilities, based on the doctrine of frustration of purpose.

Following oral argument, the trial court granted summary judgment in favor of Landlord for unpaid rent except when Tenant was prohibited from operating his business, i.e. March 19, 2020 – June 4, 2020, and denied summary judgment for unpaid utilities and attorney's fees. The trial court granted summary judgment in favor of Tenant regarding the unpaid utilities and attorney's fees and denied summary judgment to excuse his performance. The total amount awarded to Landlord was $36,079.36.[2] This timely appeal followed.

_____

[1] The arbitration award does not indicate how it arrived at that amount.

[2] We note that the summary judgment order did not include a sum certain. On April 1, 2024, we remanded the case to the trial court for the limited purpose of entering judgment for a sum certain. The trial court complied on April 9, 2024.

Tenant raises a single issue for our review: "Did the [c]ourt err as a matter of law insofar as it found [Tenant]'s obligation to pay rent was not discharged by the doctrine of frustration of purpose?" Tenant's Brief at 4.

In reviewing the grant or denial of summary judgment, the standard of review is *de novo*, and our scope of review is plenary. ***Khalil v. Williams***, 278 A.3d 859, 871 (Pa. 2022).

> We have explained that a trial court should grant summary judgment only in cases where the record contains no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. It is the moving party's burden to demonstrate the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the non-moving party. . . An appellate court may reverse a grant of summary judgment only if the trial court erred in its application of the law or abused its discretion.

***Id.*** There are no genuine issues of material fact, as the parties stipulated to the facts. The question therefore, is whether the court erred as a matter of law when it denied Tenant summary judgment.

Pennsylvania law recognizes the doctrine of frustration of purpose as a valid defense to performance under a contract. ***See Greek Cath. Congregation of Borough of Olyphant v. Plummer***, 12 A.2d 435, 439 (Pa. 1940). We are guided by the Restatement (Second) of Contracts § 265 (1981), which provides:

§ 265. Discharge by Supervening Frustration

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an

event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render the performance are discharged, unless the language or the circumstances indicate the contrary.

Our Supreme Court has explained:

When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved. . . . A court can and ought to examine the contract and the circumstances in which it was made, not of course to vary, but only to explain it, in order to see whether or not, from the nature of it the parties must have made their bargain on the footing that a particular thing or state of things would continue to exist. And if they must have done so, then a term to that effect will be implied, though it be not expressed in the contract.

**Greek Cath.**, 12 A.2d at 439 (internal citations omitted). To invoke the doctrine of frustration of purpose, three elements must be met: (1) the purpose frustrated must be the principal purpose of the party asserting the doctrine in making the contract; (2) the frustration must be substantial; and (3) the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. **9795 Perry Highway Mgmt., LLC v. Bernard**, 273 A.3d 1098, 1104 (Pa. Super. 2022), *appeal denied*, 289 A.3d 888 (Pa. 2022).

Tenant's argument focuses on the amount of time that he was prohibited from conducting business compared to the amount of time remaining on the lease. "[Tenant] was completely forbidden from using the Leased Premises for 1/3 of the Lease term. As such, the principal purpose of the Lease

Agreement was substantially frustrated by a completely unforeseen event," the March 6, 2020 disaster proclamation. Tenant's Brief, at 8-9. We disagree.

The first element is whether the principal purpose of the lease was frustrated. "It is not enough that he or she had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Restatement (Second) of Contracts, § 265 (1981), comment a.

Tenant argues that the principal purpose of the lease is "the operation of an in-person insurance sales office." Tenant's Brief, at 10. "Once the Governor issued his disaster proclamation on March 6, 2020, performance of this principal purpose of the lease agreement became impossible." *Id.* at 10-11. However, the March 6, 2020 disaster proclamation did not prohibit private entities from operating their business. It merely delegated authority to certain Commonwealth officials and appropriated funds to the emergency management agency. Non-essential businesses were ordered to cease operations on March 21, 2020, thirteen days *after* Tenant vacated the Leased Premises.

Additionally, the closure order was lifted, and Tenant permitted to resume his business operations, on June 5, 2020. There were four months remaining on the lease in which Tenant could have operated his business but simply chose not to. Thus, the principal purpose of the lease did not come to

an end. It was only temporarily suspended from March 17, 2020 to June 4, 2020. Therefore, we cannot find that the principal purpose of the lease was frustrated by the March 6, 2020 disaster proclamation.

Even if we found the principal purpose was frustrated, it was not substantial. "It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." Restatement (Second) of Contracts, § 265 (1981), comment a. This Court recently found that a 78-day closure due to the COVID-19 closure order was not substantial. *9795 Perry Highway*, 273 A.3d at 1106-07.

Tenant attempts to distinguish *9795 Perry Highway* by arguing that he was prohibited from operating for 33% of the total lease term, whereas the closure in *9795 Perry Highway* was less than 5% of the total lease term.[3] We find this argument unavailing. In finding that frustration was not substantial in *9795 Perry Highway*, we explained:

> Appellants were more than two years into the six-year lease when the COVID-19 pandemic caused the relatively short-term, approximately 78-day closure. Had Appellants not vacated the premises, they could have reopened, albeit at a reduced capacity, on June 5, 2020. **This is not the "substantial" frustration**,

_____

[3] Tenant states that he was unable to operate his business for four months – March through June 2020. This statement is misleading as the parties stipulated that the governmental closure was from March 17, 2020 to June 5, 2020 – a total of 77 days.

> discussed in **Step, supra**, that allows for the application of the doctrine of frustration of purpose. Rather, Appellants **experienced a situation where it was "less profitable"** for Appellants to operate their business, which is an insufficient basis for invoking the doctrine.

**Id.** at 1106-07. (emphasis added). We do not agree with Appellant that "[t]he key to the Court's analysis [in **9795 Perry Highway**] . . . was a relatively short closure in light of the relatively long term of the lease." Appellant's Brief, at 12. Rather, this Court found that frustration was not substantial because the relatively short closure, **combined with** Appellant's decision not to reopen on June 5, 2020, caused the business to be less profitable. **9795 Perry Highway**, **supra**.

Likewise, the frustration suffered by Appellant in the present case was not substantial. The period of closure here, 77 days, was virtually identical to the relatively brief period of closure in **9795 Perry Highway**. While this closure made Tenant's business less profitable, he could have reopened on June 5, 2020 but chose not to. Moreover, nothing prevented Tenant from utilizing telephone, video conferencing or other Internet-based communications to sell insurance during the 77-day closure period. Accordingly, the second element is not satisfied.

The third element of the doctrine is whether the non-occurrence of the frustrating event was a basic assumption on which the contract was made.

> The premise of this requirement is that the parties will have bargained with respect to any risks that are both within their contemplation and central to the substance of the contract; as Justice Traynor said, "[i]f [the risk] was foreseeable there should

have been a provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed."

***9795 Perry Highway***, 273 A.3d at 1104-05.

Here, the court found that "it is implausible for [Tenant] to contend that he did not anticipate [assuming] the risk of being obligated to pay rent" based on the *force majeure* clause of the Lease. ***Id.*** at 7. We agree. The *force majeure* clause specifically contemplates the possibility of "restrictive governmental laws or regulations" and explicitly states that it does not excuse the obligation of paying rent. ***See*** Lease, ¶ XV, Section 15.13.[4] "Moreover, while the COVID- 19 pandemic may not have been [expected], temporary closure of a building due to forces outside the control of either party is foreseeable." ***9795 Perry Highway***, 273 A.3d at 1107. Therefore, the third element is not satisfied.

_____

[4] This provision states, "In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder, **except for the payment of money**, by reason of strikes, lock-outs, labor troubles, inability to procure labor or materials, failure of power, **restrictive governmental laws or regulations**, unusual weather conditions, unavailability of services of transportation or personnel, Acts of God, riots, insurrection, war or other reason of a like nature not the primary fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. **The provisions of this Section shall not operate to excuse prompt payment [of all] Rent**, including but not limited to, Fixed Minimum Rent, Additional Rent or other payments to be made by Tenant pursuant to this Lease." Lease, ¶ XV, Section 15.13 (emphases added).

In sum, we find that Tenant failed to satisfy the doctrine of frustration of purpose.  The principal purpose of the lease was not frustrated by the March 6, 2020 disaster proclamation, and even if it was, the frustration was not substantial.  Additionally, Tenant assumed the risk of paying rent pursuant to the *force majeure* clause of the lease.  Accordingly, the court properly entered partial summary judgment in favor of Landlord.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/23/2024