## Stoetzel *versus* Jackson et al.

1. Whether land is to be taxed as seated or unseated depends altogether upon the appearance it may present to the eye of the assessor. The question is one of fact, and not of intention or of title. Where there appears to be such a permanent improvement as indicates a personal responsibility for taxes, the land should be returned and taxed as seated. It is not the assessor's duty to inquire what is the nature of the improver's title, or whether he has any title at all.

2. The building of a cabin on land as a shelter for miners which is afterwards abandoned and altogether disappears, and an occasional digging of coal by a trespasser, even under color of title, is not sufficient to seat a tract of land so as to invalidate a sale thereof for taxes as unseated.

March 6, 1884. Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ. PAXSON, J., absent.

ERROR to the Court of Common Pleas of *Columbia county.*

Ejectment, by John A. Jackson and wife, George D. Heron and wife, Charles J. Tower, and Robert M. Cummings against Eli Stoetzel, to recover possession of a tract of land in Conyngham township, described in the writ as containing three hundred eighty-six acres and sixteen perches.

On the trial, before ELWELL, P. J., the plaintiffs gave in evidence a warrant from the Commonwealth to Ebenezer Branham for a tract of four hundred acres then in Northumberland county, upon which a survey was made and returned to the land office, and a patent thereupon issued to Peter Grahl for four hundred and forty-one acres. The title thus derived from the Commonwealth to Peter Grahl, by sundry mesne conveyances, became vested in Jeremiah Tower, whose title the present plaintiffs hold, and held at the commencement of this suit, in 1879.

Defendant claimed title by virtue of three tax sales of land, assessed and sold as *unseated*, viz:

(1.) A sale in Columbia county, June 12, 1854, by the treasurer to William W. McWilliams, for the taxes of 1852 and 1853, then in the township of Roaring Creek, in the said county.

(2.) A sale in Montour county, June 12, 1854, by the treasurer to James Boyd, for the taxes of 1851 and 1852, in the township of Roaring Creek, then in the said county.

(3.) A sale in Columbia county, June, 1862, by the treasurer to Samuel J. Packer, for the taxes of 1861 and 1862, then in the township of Conyngham, in the said county.

Plaintiffs, in order to show that the tax sales were invalid, produced evidence (recited in the extract from the charge of the court printed *infra*), to show that the tract was *seated*, and asked the court to charge, inter alia, as follows:

" 8. That John Kline having made an entry on the Ebenezer Branham tract about the year 1822, making a claim to it, erecting buildings on the same at different times, constructing a road to the mines, and continuing regularly year after year to mine coal, and maintain his possession for a period of twenty-one years, and drawing profits therefrom, his occupancy was under color of title, and made the land seated."

*Answer.* " I affirm this point, so far as regards the land within the lines of the Sharpless survey, holding that the uncontroverted facts shown in reference to the use and occupancy of that tract are sufficient, if believed, to render the land within its bounds seated. I add, that where one has acquired color of title, his acts on the ground are referable to his claim of ownership, and, where they show an intention of permanent occupancy and a visible drawing of profits from

[Stoetzel *v.* Jackson.]

the land, may seat it, when they would not, were the acts those of a stranger having neither title nor color of title."

The court also charged on the same subject as follows:

" The plaintiffs allege that the treasurer's sale did not divest their title, for the reason, as they say, that the land was not unseated, but on the contrary, seated. In order to establish that fact, they have given in evidence acts of John Kline (and of those under him), for half a century or more, in regard to taking coal out of an opening on this land, the kind of buildings there, the personal property, when operations were carried on, what was done with the coal taken out; have shown you that it was an outcropping vein of coal, that owing to a fault or break they removed to another opening at a considerable distance, that coal was taken out for uses in the neighborhood, but it does not appear that any colliery was erected there, or that there was any preparation of coal for market. If the matter stood just there, if there was nothing more in the case than that John Kline and the neighbors (perhaps under him as tenants) occasionally along in the summer time took coal from there, in the winter did not operate the works at all, remaining there during the week and going home Saturday night, no residence upon the property, no home, no family there, no other occupation except of the character that I have mentioned, John Kline being an entire stranger to the title ; I would hold, under these facts, that the tract was not seated by those acts (any or all of them) that have been proven in this case, taking the testimony all for true.   But it is alleged that John Kline was not without some show of right to this land, that he made a bonâ fide claim to it ; and in order to establish that allegation, a warrant is given in evidence, dated in 1824, to one Sharpless, and a survey thereon, all of which (with a very small exception at one end) is within the boundaries of the Branham tract, and embraces, according to Mr. West's testimony, the coal-openings called Kline's mines. Within a short time after (I haven't the date of the deed), in 1832, the warrantee of the Sharpless warrant conveyed an undivided one fourth of that tract to Kline, who thus became tenant in common with the other owners, having whatever rights there were under that warrant.

" The question arises here, whether this gave him what is called color of title, whether he stood upon any higher ground after he acquired that Sharpless title than he did before ; up to that time he certainly did not seat the tract, because he was a trespasser without right or color of right. From 1832, Kline's occupancy and possession, whatever they might be, did not and could not extend beyond the fixed and known boundaries of the Sharpless tract; he bound himself to them by claiming

[Stoetzel *v.* Jackson.]

under the Sharpless warrant. Color of title may be by a void deed or by a younger warranted survey laid upon an older; here the Branham title was clearly the best, because it was the oldest. But when Sharpless had laid his warrant there, paid the Commonwealth for it, and taken out a patent; and when John Kline had obtained a deed for a part of it; if, from that time on, he occupied, claiming under this title, and did the acts that are testified to here, I hold now, as in the former trial, that such acts might operate to seat the land embraced within the Sharpless survey and no more, because it is to be presumed (unless there is something to show the contrary) that he had bound himself by those lines, and could not extend them."

Verdict for plaintiff and judgment thereon.

Whereupon defendant took this writ, assigning for error, inter alia, the answer to the above point, and the portion of the charge above quoted.

*George F. Baer* ( *Chas. R. Buckalew* with him), for plaintiff in error.—The official assessments show that the land was assessed as *unseated* land, and it is well settled that it is the assessment that establishes the fact whether land is seated or not. Nor does the fact that the party in possession dug coal at the outcrop of the vein on this tract overcome this evidence and show that it was his intention to treat the land as seated, when he never had it assessed or paid any taxes.

[GORDON, J. I have supposed that the question whether land was "seated" or "unseated" was a question of fact, and never one of intention or of title.]

*Mr. Baer.* As a general thing that is so, but not always; for instance if the owner of land enter and begin to improve, with the intention of going on and residing on it, but when the assessor comes round sufficient work had not been done to justify its assessment on the "seated" list; but the owner goes on, and within the year builds and improves so that it is undoubtedly seated, his work will relate back to the beginning of the year, and save him from losing his land by a subsequent tax sale on "unseated list."

What is "seated" land? The term was originally synonymous with "settled"—a settled or seated country; hence "country seat," "site" of a building, &c. What is "unseated" land? We can say that it is the reverse of seated; but it is most unfortunate that the meaning of the word *unseated*, on which the titles to the most valuable lands in the Commonwealth depends, should still be uncertain. It is a singular fact that in determining the meaning of "unseated," none of the cases refer to the Act of Assembly where the term was

[Stoetzel *v.* Jackson.]

first used.   The Act of 3rd April, 1804, Pur. 1441, says : "All unseated· lands within this Commonwealth, held by individuals, companies, or bodies corporate, either by improvement, warrant, patent or otherwise, shall for the purpose of raising county rates and levies be valued and assessed in the same manner as other property."   In the Act, lands held by improvement are denominated *unseated*.   Now the legislature well knew the meaning of title by improvement.   In Bixler *v.* Baker, 4 Binney, 217, C. J. TILGHMAN said: "In our Acts of Assembly and in common parlance, there is a difference between an improvement and a settlement.   An improvement may be made by. clearing land, and cultivating it without residing on it.   A settlement requires an actual residence." It seems to us much of the confusion in the decisions would have been obviated by adhering to the definition which the ·Act itself placed on the word *unseated :* Bixler *v.* Baker, 4 Binney, 217 ; Campbell *v.* Wilson, 1 Watts, 503 ; Harbeson *v.* Jack, 2 Watts, 125 ; Bechdle *v.* Lingle, 16 P. F. S., 38 ; McArthur *v.* Kitchen, 27 P. F. S., 62 ; Kennedy *v.* Daily, 6 Watts, 270 ; Foster *v.* McDivit, 9 Watts, 347 ; Rosenburger *v.* Schull, 7 Watts, 391 ; Wallace *v.* Scott, 7 W. & S., 248 ; Milliken *v.* Benedict, 8 Barr., 175 ; Hathaway *v.* Elsbree, 4 P. F. S., 505 ; Ellis *v.* Hall, 7 Harris, 292 ; Jackson *v.* Sassaman, 5 Casey, 107 ; Greenough *v.* Fulton Coal Co., 24 P. F. S., 486. The first case in Pennsylvania in which there was any intimation that profits made out of the land in any other way than by cultivation, would in themselves make the land seated, was Lackawanna Iron Co. *v.* Fales, 5 P. F. S., 90.   The point did not arise in the case, and the language of Judge THOMPSON cannot·be construed as deciding that mining a few tons of coal in ·the winter, at the outcrop ·of a vein, without any improvements or indication of permanent occupancy, will have the effect of seating the land.   What he meant was, that such improvements and permanent occupancy as are usual and customary in the business of mining coal and mining ore would have that effect.   In all the prior cases, there was either actual residence. or growing of crops on the land at the time of the assessment.

*John. G. Freeze* and *A. J. Dietrick*, for defendant in error.— The old doctrine requiring residence or cultivation to seat a tract of land· has been so modified that where the owner derives profit from the land it may be seated: Jackson *v.* Stoetzel, 6 Norris, 305, and cases cited in the opinion ; Lackawanna Iron. Co. *v.* Fales, 5 P. F. S., 90.   In Watson *v.* Davidson, 6 Norris, 270, this court allowed to stand unquestioned the following remark of the Judge below : "To open out a

[Stoetzel v. Jackson.]

mine of ore or coal and carry on the business of mining and
disposing of mineral or coal on a tract of land, would be good
evidence that it is seated." The evidence in this case was
ample to establish the fact that the land was seated at the
time of the sheriff's sales of it as. unseated, under which the
defendant claimed.

Mr. Justice GORDON delivered the opinion of the court,
March 24, 1884.

Land may be seated as well by an intruder as by an owner:
Sheaffer v. McKabe, 2 Watts, 421; Rosenburger v. Schull, 7
Watts, 390; Jackson v. Sassaman, 5 Ca., 106. It follows that
the question of whether a tract of land is seated or unseated
depends altogether upon what has been, or is being done upon
it; upon the appearance which it may present to the eye of
the assessor. As was said in one of the cases above cited,
Rosenberger v. Schull, the assessor has nothing to do with the
misapprehensions or mistakes of the occupant; it is his busi-
ness to return the land as seated if he finds upon it such
permanent improvements as indicate a personal responsibility
for its taxes. On the other hand, if there be no such improve-
ments he must return it as unseated. Neither is it the business
of the assessor to inquire how the improver holds the property,
whether by title perfect or imperfect, or by no title at all.
This concerns neither him nor the public; for the question is
but how the taxes shall be collected: if seated, then from some
person; but if unseated, from the land itself. But if there has
not been enough done upon the premises to seat them, we
cannot see how the matter can be helped out by the introduc-
tion of somebody's title, whether colorable or substantial.

We can understand, as was said in this very case, when in
this court before, 6 Norris, 302, on the authority of the Lack-
awanna Iron Co. v. Fales, 5 P. F. S., 90, how the entry of one
claiming title may be used to indicate the beginning of an
improvement, but as was there said, this initial occupancy, to
have any effect, must be the beginning of such a permanent
and continuous use of the property as will in the end fix its
character as seated.

Now, Kline says he not only built the first house, or cabin,
upon this land as a shelter for those working in the mine, but
also as an improvement upon which to make an application
for a warrant. There was, therefore, from the beginning of
this case, no want of color of title in Kline; his claim as an
improver was just as good as that under the worthless Sharp-
less warrant. Color of title in itself is nothing; it merely
marks the integrity of a man's claim, and the improvement in
this case was just as good as an indication of the honesty of

[Stoetzel *v.* Jackson.]

Kline's intention as was the warrant. We are therefore at a loss to know why it was thought that this question of colorable title was not in the case when here before. But however Kline claimed, be his title good or bad, actual or fictitious, it helps not the subject in hand; it does not seat, nor help to seat, the tract in controversy. The question we have to deal with is, after all, one of fact and not of intention. From and after the time this man first built his cabin and commenced the taking out of coal, had he continued his improvement, or had he even maintained a permanent and continuous occupancy, he might have succeeded in seating the premises which he claimed, but it is a sure thing that if his first operation did not fix that character upon the property, and we have decided that it did not, nothing he subsequently did had that effect. His first cabin, never used for anything but a temporary shelter for those who occasionally took out coal, was abandoned and finally disappeared altogether, and the building at the second opening was a mere shanty, as an improvement, of no value whatever. True, he took coal from the land, but how did this seat it? There were no fixtures of a valuable character in or about the mine; nothing that would indicate that the mining, rude as it was, was carried on as a regular and continuous business. In fine, adopting the rule of Watson *v.* Davidson, 6 Norris, 270, the occupancy of Kline was not of such a character as to be visible and known to every one whose business it was to see and know it. In fact, no one could, from the mere appearance of things, tell whether coal had been taken from the property by one claiming to own it, or only by an occasional trespasser.

We are obliged, therefore, to disagree with the learned judge of the court below, though conscious of his ability as a land lawyer, and to sustain the first assignment of error.

The second assignment has not been urged, hence we pass it without comment.

> The judgment is reversed and a new venire ordered.