Harold E. Miller *v.* Emanuel S. Leopold, Appellant.

Harold E. Miller *v.* Ardie J. Dillen and Isaiah Scheeline, Jr., Trustees for the Baker Estates, Appellants.

Argued October 27, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

484

John E. Eberhardt, Jr., with him Emanuel S. Leopold, Isaiah Scheeline, and Scheeline & Leopold, for appellants.

Richard G. Kotarba, with him Meyer, Unkovic & Scott, for appellees.

OPINION BY JUDGE MENCER, March 2, 1976:

Harold E. Miller (Miller) commenced an action against Emanuel S. Leopold (Leopold) to quiet title to an 18-acre tract in which his claim of title was founded upon a county treasurer's sale.[1] Leopold filed an answer containing new matter in which he averred that his title to the land in question was based upon the foreclosure of a mortgage which had not been divested by the tax sale proceedings.

Some 7 years later Miller commenced a second action against Ardie J. Dillen and Isaiah Scheeline, Jr., Trustees for the Baker Estates, to quiet title to a 4.6-acre tract. This action was based on the same tax title as that involved in the earlier proceeding.

Both actions were referred to a master, and the parties stipulated that they be consolidated for the purpose of trial. Miller amended the pleadings to designate Donald M. Geesey and Phil Klevan as additional plaintiffs, pursuant to the provisions of a declaration of trust wherein Miller purportedly held title to the land in

---

1. To date this case has spanned a period of nearly 23 years, a fact that brings little credit to our court system or the ingenuity of counsel.

question, *inter alia,* for himself and the additional plaintiffs. After a hearing, the master filed his report recommending the entry of judgment in favor of the plaintiffs. The Court of Common Pleas of Blair County confirmed the report nisi, and defendants filed exceptions thereto which were dismissed, and judgment was entered in favor of the plaintiffs. This appeal followed.

The issues raised necessitate the setting forth of the facts in some detail.

Elias Baker was one of the famous ironmakers in Pennsylvania history. During his lifetime, he acquired vast holdings of real estate both by patent and by purchase in what was first designated as Huntingdon County and later included in the newly formed Blair County. He maintained a limestone quarry which has been inactive for almost a century but which is still visible upon the land in dispute in this appeal. He operated an ore furnace on land on the present site of the Altoona Women's Club. Several hundred feet further west of this property he erected his large home or mansion which is now the headquarters of the Blair County Historical Society and one of the most famous landmarks in Blair County history.

The land in dispute in this appeal was owned by Mr. Baker over a century ago. At the time of his death, all his real estate was devised to his widow and children. Upon the death of his widow, title to the lands then remaining, including the land in dispute in this appeal, became vested in his heirs where it remained until 1920. In 1920, the title was vested in his heir, Louise Woods Beckman. By deed dated December 15, 1920, Louise Woods Beckman and Ernst Beckman, her husband, conveyed title to F. Woods Beckman and John Cree, as trustees under a certain declaration of trust. One of the properties thus conveyed was described therein as "398 acres Mansion or Furnace Tract." No further legal description for this land appears in the records of Blair County. Many valuable improvements have since been

erected upon various areas of this tract, the title to which stems from this simple legal description.

In 1914 and prior thereto, the portion of the Mansion or Furnace tract in dispute was located in the Second District of Logan Township in Blair County. There were two assessments in this district in 1914. One assessment was "128 acres Mansion Farm". The other assessment was "160 acres clear Brush Run" and "80 acres timber Brush Run" for a total of 240 acres.

In 1915, the Fifth District of Logan Township was formed and extracted from the Second District. That portion of the Second District bounded by the City of Altoona and the Seventh District of Logan Township on the north, by Plank Road and the new Pleasant Valley Boulevard on the east, by the Logan Valley and Burgoon Roads on the south, and by the Third District of Logan Township on the west was transferred into the Fifth District. Lands on the northwest side of the new Pleasant Valley Boulevard were in the Fifth District while those on the southeast side of the new Pleasant Valley Boulevard were in the Second District. The land in dispute lies to the northwest of the new Pleasant Valley Boulevard and accordingly was located in the Fifth District of Logan Township from 1915 to date.

Assessment records for 1915 show that the entire 128-acre Mansion Farm assessment was transferred into the Fifth District. Only 80 acres of the Brush Run Farm assessment were transferred into the Fifth District, and the other 160 acres of the Brush Run Farm assessment were retained in the Second District. The Mansion Farm assessment in the Fifth District remained the same until 1924 when it was reduced by 20 acres to reflect a conveyance to the Altoona School District for its athletic field.

In 1926, 51 acres of the Mansion Farm assessment were plotted as "Allegheny Furnace", and accordingly the assessment records were reduced from 108 acres to 57 acres. The 57 acres included within the assessment

were adjacent to the Allegheny Furnace tract located on the westerly side of Mill Run Creek and Union Avenue.

From 1926 until 1937, the land owned by the Baker Estates bounded by the City of Altoona on the northwest, the Bell Farm on the northeast, the new Pleasant Valley Boulevard on the southeast, and by Union Avenue on the southwest was all the land that remained from the Mansion or Furnace tract which was located in the Fifth District of Logan Township. The area occupied by this land was approximately 137 acres. The only assessments contained in the assessment records of Blair County were "57 acres Mansion Farm" and "80 acres timber Brush Run."

On August 1, 1927, F. Woods Beckman and John Cree executed a mortgage to the Peoples Savings and Trust Company of Pittsburgh. The mortgagors were designated as "Trustees of the Baker Estates," and the mortgage was captioned "Mortgage from the Baker Estates by Trustees to Peoples Savings and Trust Company of Pittsburgh." The mortgage recited that the "Baker Estates is an expressed trust existing under and by virtue of a certain Declaration of Trust made and dated December 15, 1920." Included within the mortgage were 106.8 acres of land. This land in fact included all of the land assessed as "80 acres timber Brush Run" and approximately 27 acres of the Mansion Farm total assessment of 57 acres.

The major portion of the balance of the 57-acre Mansion Farm assessment was included in a mortgage given by the Baker Estates to Charles Copley Harding and was conveyed to Charles Copley Harding by indenture under date of November 8, 1937. A comparison of the westerly boundaries of the land described in the mortgage to Peoples Savings and Trust Company with the easterly boundary of the land described in the mortgage to Charles Copley Harding discloses a small piece of land remaining between these two pieces of ground, approximately 4 acres of which are involved in this proceeding.

In 1929, the trustees of the Baker Estates defaulted in the payment of their taxes on the "57 acres Mansion Farm" assessment. Land Ledger N, page 111, in the county treasurer's office discloses that the unpaid county, poor, school, and road taxes were prorated between 30 acres and 27 acres of the assessment. The share of the taxes assigned to the 27 acres was paid or redeemed by the Peoples Savings and Trust Co. on October 5, 1932. The share of the taxes assigned to the 30 acres remained unpaid, and the 30 acres were sold by the county treasurer to the county commissioners in 1932.

No subsequent taxes were paid on either the 30-acre or 27-acre parcel. Finally, the 27-acre parcel was included in the 1940 county treasurer's sale for failure to pay the 1930 and 1932 through 1938 taxes assessed against the 27-acre parcel. The amount of these taxes assessed against the 27-acre parcel was the sum claimed at the sale and in the advertisements. The treasurer deeded the property to the commissioners. The purchase was regularly entered in the sales docket maintained by the county commissioners. Both the treasurer's sales books and the commissioners' sales docket reflect that three lots were redeemed from this assessment and were not included in the sale. The sales docket contains notations showing that 2½ acres were sold to E. G. Burket and 2.514 acres were sold to William and Kathryn R. Rogers. Both of these parcels are located within the above described 137 acres assessed in the Fifth District of Logan Township. The Rogers property adjoins the Burket property and the land here in dispute.

In 1942, the county commissioners sold the land identified as "27 Acres Mansion Farm (less 3 lots)—Logan Township—Fifth District" to Amos Davis, the delinquent-tax trustee. Kenneth B. Vaughn, successor trustee, sold the land to Harold E. Miller on January 9, 1953, upon payment of all the unpaid taxes of said parcel to date.

In 1952, Emma B. Adams was the successor trustee to the Peoples Savings and Trust Company of Pittsburgh under the mortgage made by the Baker Estates dated August 1, 1927. By indenture dated May 8, 1952, Emma B. Adams as successor trustee sold to John H. Bragdon the remainder of the 106.8 acres under the mortgage less the land of the Altoona Housing Authority condemned in 1950. The sale was conducted pursuant to a power to sell and not by judicial foreclosure. On the same date, John H. Bragdon and Roberta Q. Bragdon, his wife, conveyed the same land to Leopold.

The defendants, appellants here, advance a number of contentions, each of which they assert is reason for reversal. We will consider these contentions under four general headings.

## PLAINTIFFS NOT ONLY FAILED TO PROVE A VALID TAX SALE, BUT THEIR OWN EVIDENCE PROVED THAT THE TAX SALE WAS VOID

Although there exists a difference of opinion among those who have dealt with this case previously as to whether the land in question when sold at a treasurer's sale in 1940 was seated or unseated land, we conclude that we are dealing here with seated land.[2] Whether a tract of

2. Those who contend that in 1940 the land was unseated acknowledge that prior to 1927 it was properly assessed as seated because the larger tract designated as "Mansion Farm" was in fact seated by improvements. This being so, we conclude that subsequent assessments reflecting the sale of portions of the "Mansion Farm" tract did not convert the assessment to an unseated classification. Further, we would note that prior to the Act of June 3, 1885, P.L. 71, 72 P.S. §5933, the sale of land which mistakenly appeared on the wrong list was invalid. *Scott v. Bell*, 344 Pa. 243, 25 A.2d 308 (1942). That validating statute, however provided that "[a]ll sales of seated or unseated lands within this commonwealth which shall hereafter be made for arrearages of taxes due thereon, shall be held, deemed and taken to be valid and

land is seated or unseated depends upon what has been, or is being done, upon it. If upon the land there are such permanent improvements as indicate a personal responsibility for its taxes, it is assessed as seated. If there be no such improvements, the land is assessed as unseated. *Stoetzel v. Jackson*, 105 Pa. 562 (1884). Therefore, the treasurer's sale held on January 30, 1940 was subject to the provisions of the Act of May 29, 1931, P.L. 280 (Act of 1931), *as amended* by the Act of June 20, 1939, P.L. 498, 72 P.S. §5971a et seq. Section 1 of this act, 72 P.S. §5971a, mandates that the tax collector file with his return on unpaid taxes a description of the real estate sufficient to identify the land, together with the name of the owner or reputed owner.

Plaintiffs assert here that the assessment "Baker Estates 57 Acres Mansion Farm" was insufficient to identify the land assessed and any sales based on such a description were nullities.

We agree that no tax sale of land is valid unless both the assessment and the conveyance by the treasurer contain sufficient descriptions to identify and disclose the property taxed and sold. *Fisk v. Corey*, 141 Pa. 334, 21 A. 594 (1891). What is necessary is not a description by metes and bounds, but an identification of the land sufficient to enable the tax collector and the public to determine what property is being assessed or sold. *Hunter v. McKlveen*, 361 Pa. 479, 65 A.2d 366 (1949).

We are satisfied that the description here was permissible and sufficient. The assessment states the size of the tract in acres and contains an identification by a farm

---

effective irrespective of the fact whether such lands were seated or unseated at the time of the assessment of such taxes." The law today remains the same, conditioned solely by the requirement that the sale follow the assessment. *Blair v. Pennsylvania Turnpike Commission*, 152 Pa. Superior Ct. 555, 562, 33 A.2d 490, 493 (1943).

designation. More significantly, the property was known in the community as "Baker Estates" land. Both the master and the lower court stated that the earlier description of "398 acres Mansion or Furnace Tract" in the deed dated December 15, 1920 and given by heirs of Elias Baker to F. Woods Beckman and John Cree, Trustees, has been accepted by title lawyers and lending institutions in Blair County as a determinable and identifiable property since 1920. Our examination of this record convinces us that "Baker Estates, Mansion Farm" had a meaning and certainty not only to its owners, but to assessors, tax collectors, and the public generally. In fact, this description was sufficient to enable the trustees to sell portions of the 398-acre tract for Columbia Park and the Altoona High School athletic field and to satisfy the Peoples-Pittsburgh Trust Company to accept a mortgage on a portion of this tract. *See Wilson v. A. Cook Sons Co.,* 298 Pa. 85, 148 A. 63 (1929). In *Bannard v. New York State Natural Gas Corporation,* 448 Pa. 239, 293 A.2d 41 (1972), a Union Township seated assessment reading "153 mineral—Blanchard Charles Est." was held to be a sufficient description and would not fail for vagueness. Our holding here is deemed consistent with *Bannard.*

Appellants assert that the prima facie presumption of the regularity of the acts of public officials in tax sales is overcome by the plaintiff's evidence, citing *Hughes v. Chaplin,* 389 Pa. 93, 132 A.2d 200 (1957). Our evaluation of the evidence offered causes us to reach a contrary conclusion. A treasurer's deed can be defeated only by fraud or want of authority to sell, and even gross defects or irregularities are cured by the absolute confirmation of the sale. *Thompson v. Frazier,* 159 Pa. Superior Ct. 395, 48 A.2d 6 (1946). In addition to there being no evidence of fraud, we find, contrary to appellants' contention, no evidence as to a deficiency in the notice of the sale or of the authority to sell.

## THE TRACT OF LAND WHICH IS THE SUBJECT OF THIS ACTION WAS ASSESSED AS BRUSH RUN FARM AND NOT AS MANSION FARM

Appellants contend that the land in dispute here was a part of the Brush Run Farm and not a part of the Mansion Farm and therefore both the assessment and the tax sale on the assessment were nullities. The master found —and the lower court adopted his finding—that the land in dispute was in fact a part of the Mansion Farm and that the various assessment designations utilizing "Mansion Farm" included the land in dispute.

Our study of this record, including its 84 exhibits, satisfies us that there is substantial and convincing evidence supporting the finding of the master, adopted by the court, on this issue. We, as did the master, find impressive the testimony of one George Ventre, an old-time resident of the area who was familiar with the various farm lands of the Baker Estates. Mr. Ventre was of the opinion that the disputed land was a part of the so-called "Mansion Farm" of the Baker Estates land.

Additionally, we conclude that the location of the land in question as part of the Mansion Farm can be established from a synthesis of a 1908 Baker Estates map, the conveyances out of the Baker Estates, the assessment records, and related land areas subject to recorded mortgages. Contrasted to these public records are the private records advanced by the appellants in support of their theory that the disputed land was a part of the land assessed "Brush Run Farm." Any divergence between the public records and private records as to assessments and the imposition of taxes would likely bring into question the accuracy of the respective records. Accordingly, we agree with the master's view that "for the purposes of assessment, taxes and tax sales, the assessor's records must prevail over the internal bookkeeping of the owners and especially when the owners, as they must [be] presumed to be, received bills for taxes on land assessed in

one manner, kept on their books in a different way, and raised no objection over a period of many years . . . and produced no tax receipts to show they paid taxes on the land assessed."

## THE ASSESSMENT ON WHICH THE SALE WAS BASED WAS A DUPLICATE ASSESSMENT

The appellants assert that the basic assessment was void for indefiniteness and that the 1930 through 1936 assessment of 57 acres was a wholly meaningless assessment because at most it was the only description of the 2-acre residue of the Mansion Farm which remained in Logan Township after the two annexation proceedings and was in no sense such a description by which the county treasurer could identify what he was selling or the public the land that was offered for sale and that the 1930 through 1936 assessments on which the sale was based are duplicate, meaningless, and void assessments.

Appellants argue that the Mansion Farm was assessed as 128 acres from 1908 through 1923 and that annexations of portions of this tract out of Logan Township and into the City of Altoona were not properly reflected in the assessment records of Blair County. However, the assessment records for 1915 show that the entire 128 acres of the Mansion Farm assessment were transferred from the Second District of Logan to the Fifth District of Logan Township, and taxes were paid for the years 1916 through 1929 on behalf of the Baker Estates on the assessments of record during that period. More significant to this aspect of the case, the 51-acre Allegheny Furnace tract annexed into the City of Altoona in 1926 was subtracted from the Mansion Farm assessment in the same year.

Accordingly, we must dispose of this issue on the basis that the official assessment records, unobjected to by the owners of property assessed, are more likely correct than the appellant's reconstruction of those assessment records

on premises and assumptions concerning per-acre valuations presumed to be used by the assessors. We are therefore not satisfied that there was a duplicate assessment relative to the 57 acres in the Mansion Farm tract located in the Fifth District of Logan Township. Accordingly, we cannot conclude that these 57 acres are located in or assessed as part of the City of Altoona.

## THE FORECLOSURE OF THE PEOPLES-PITTSBURGH TRUST COMPANY MORTGAGE DIVESTED THE TAX TITLE ON WHICH PLAINTIFFS BASE THEIR CLAIM OF OWNERSHIP

The chronological setting for this issue is as follows:

In 1927, the trustees of the Baker Estates mortgaged to Peoples-Pittsburgh Trust Company a tract of 106 acres, including, *inter alia*, the 18 acres described in the complaint filed by Miller against Leopold.

In 1940, the county treasurer sold the 18-acre tract to the county commissioners for unpaid taxes covering the years 1930 through 1936 (taxes accrued after the mortgage had been recorded).

In 1942, the county commissioners sold the same property at *public* sale to the delinquent-tax trustee and conveyed it to him by a deed whereby they conveyed "such title as we have a right to convey."

In 1952, the said mortgage was foreclosed and the property was conveyed to John H. Bragdon, who reconveyed it to appellant Leopold.

In 1953, the delinquent-tax trustee sold a portion of the same property at private sale to Harold E. Miller, which deed recited the deeds of the county treasurer and the county commissioners.

Therefore, when the mortgage was recorded, there were no unpaid taxes accrued against the 18-acre tract in question. Section 9 of the Act of 1931, 72 P.S. §5971i,

expressly provides that the lien of the mortgage is not discharged by the treasurer's sale.[3] *Day v. Ostergard,* 146 Pa. Superior Ct. 27, 21 A.2d 586 (1941).

Nor did the county commissioners' public sale to the delinquent-tax trustee divest the lien of the mortgage. *McCauley Appeal,* 161 Pa. Superior Ct. 461, 55 A.2d 428 (1947). The delinquent-tax trustee acquired only such title as the county commissioners had a right to convey. This title or interest was the right of the original mortgagors (trustees of the Baker Estates) to comply with the terms of the mortgage and thereafter to have the mortgage satisfied and the property securing said mortgage reconveyed. The 1952 foreclosure of the mortgage divested this title or interest first held by the original mortgagors and, following the treasurer's sale, held by the county commissioners and subsequently by the delinquent-tax trustee. Accordingly, no title remained in the delinquent-tax trustee in 1953, and his deed to Harold E. Miller was ineffective and conveyed no interest in the 18-acre tract.

Thus, we are compelled to reach the conclusion that the foreclosure of the mortgage encumbering the 18-acre tract eliminated the title interest on which Miller bases his action to quiet title as to that tract.

Decree affirmed as to paragraphs E, F, G, and H (decreeing plaintiffs the owners of the 4.6-acre tract in dispute) and reversed as to paragraphs A, B, C, and D (decreeing plaintiffs the owners of the 18-acre tract in dispute).

---

3. The pertinent portion of Section 9 reads:
"Every such sale shall discharge the lien of every obligation . . ., except no such sale shall discharge the lien of any . . . mortgage which shall have been recorded before such taxes became liens, by return and docketing, as herein provided. . . ."