IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania,   :
Pennsylvania Game Commission,   :
             Petitioner   :
                     :
      v.                :  No. 497 C.D. 2021
                     :  Submitted:  February 7, 2022
International Development   :
Corporation and Atlantic   :
Hydrocarbon (Board of   :
Property),   :
             Respondents   :

BEFORE:   HONORABLE ANNE E. COVEY, Judge
             HONORABLE ELLEN CEISLER, Judge
             HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                       FILED:  March 4, 2022

Petitioner Commonwealth of Pennsylvania (Commonwealth), Pennsylvania Game Commission (Commission) petitions for review of the Board of Property's (Board) final adjudication and order (Final Adjudication), dated April 15, 2021. Through this Final Adjudication, the Board determined that Respondent International Development Corporation (IDC), rather than the Commonwealth, owns a Bradford County property's "mineral rights," due to language in a century-old deed for that property between a previous owner and the Commonwealth. After thorough consideration, we affirm.

## I. Background

The particulars of the acts that ultimately gave rise to the matter currently before us are neither recent, nor disputed by the parties to this matter. The affected property consists of 2,094 acres of wild, or "unseated," land in Bradford County,

which were purchased by Thomas E. Proctor and Jonathan A. Hill from the Schrader

Mining & Manufacturing Company in 1893 (Property).[1] Final Adjudication, F.F.

---

[1] Both the Commission and IDC agree with the Board that the Property was "unseated" land at all times relevant to this matter's disposition. *See* Final Adjudication, Findings of Fact (F.F.) ¶9; Commission's Br. at 16; IDC's Br. at 5, 15. As explained by our Supreme Court in *Herder Spring Hunting Club v. Keller*:

> Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land.[] Seated land was property that had been developed with residential structures, had personal property upon it that could be "levied upon for the tax due," or was producing regular profit through cultivation, lumbering, or mining. Robert Grey Bushong, Pennsylvania Land Law, Vol. 1, § 469(II) at 500-501 (1938). Unseated land is best understood as "wild" land but included any land that did not meet the requirements of being seated. *Id.* § 469(IV) at 501. The determination of whether land was seated or unseated land was entirely based upon the "eye of the assessor," who would traverse the county determining whether land was being developed and then "return" the land to the county commissioners to assess the property for taxation. *Stoetzel v. Jackson* [], 105 Pa. 562, 567 (Pa. 1884).

> Between the Revolution and the early 1800s, large tracts of wilderness in the interior of Pennsylvania were owned by speculators who lived on the coast in hopes that the land would increase in value as the population increased. Bushong, § 470 at 502. Many of these landowners neither developed nor paid the taxes on the land. *Id.* Notably, the owners of unseated lands were not always known by the county authorities such that personal notice could not be given. *Long v. Phillips*, . . . 88 A. 437, 438 ([Pa.] 1913) (observing that for unseated land "it frequently occurs that the owner's deed is not recorded, his name is not registered, he is not known, no one is in actual possession, and there is no apparent owner or reputed owner in the neighborhood of the property[]"). The Commonwealth developed different sets of land tax laws to address the difficulties [regarding] collecting tax on unseated land. Bushong, § 472 at 503.

> If the assessor determined that the land was seated, the land was taxed to the land owner, who was personally responsible for the payment of the taxes which could be collected against his or her personal property. *Id.* [§] 469(II) at 501. The owner of unseated land,

**(Footnote continued on next page…)**

¶¶1, 3; Reproduced Record (R.R.) at 326a-29a.[2] The following year, 1894, Proctor and Hill sold the Property to the Union Tanning Company (Union); the deed that memorialized this sale contained a clause, which stated that Proctor and Hill

> expressly reserve and save to themselves, their heirs and assigns, all the minerals, coal, oil, gas or petroleum found now or hereafter on or under the surface of any or all of the lands described in each of the above mentioned parts or division and conveyed by this indenture, together with the right and privilege of ingress, egress and regress upon said lands for this purpose of prospecting for, or developing, working or removing the same.

---

> however, was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original warrant had been issued. *See Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 475 (W.D. Pa. 1958), *aff'd*, 265 F.2d 196 (3d Cir. 1959). The current owner's name would be used "only for the purpose of description." *F.H. Rockwell & Co. v. Warren County*, . . . 77 A. 665, 665-666 ([Pa.] 1910). As explained by this Court in 1841,
>
> > [T]he land itself, and not the owner of it, is debtor for the public charge; and it is therefore immaterial, at the moment of sale, what may be the state of the ownership, or how many derivative interests may have been carved out of it. With these the public has no concern. They are sold with the land, just as a remainder would be sold with the particular estate.
>
> *Strauch v. Shoemaker*, 1 Watts & Serg. 166, 175 (Pa. 1841) (quotation marks omitted); *see also Bannard v. New York State Natural Gas Corp.*, . . . 293 A.2d 41, 49 ([Pa.] 1972) (holding that "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes"). As was true for seated land, . . . unseated land could be severed into surface and subsurface estates, which could be separately assessed, taxed, and, if necessary, sold at tax sale. *Rockwell*, 77 A. at 666.

143 A.3d 358, 363-64 (Pa. 2016) (footnote omitted).

[2] The Commission has inexplicably seen fit to submit a reproduced record containing a number of pages that are illegible and/or upside down.

Final Adjudication, F.F. ¶5; R.R. at 42a; *see* R.R. at 30a-44a (1894 deed from Proctor and Hill to Union).[3] This reservation was never reported to the County Commissioners of Bradford County and, as a result, the Property "was [still] assessed and taxed as a whole" after the sale. Final Adjudication, F.F. ¶10. Nearly a decade passed, before Union deeded the Property's surface interests to the Central Pennsylvania Lumber Company (CPLC) in 1903. *Id.*, F.F. ¶6; R.R. at 345a-51a. Subsequently, property taxes assessed against warrants[4] encompassing both the

---

[3]    Pennsylvania law recognizes three discrete estates in land: the surface estate, the mineral estate, and the right to subjacent (surface) support. . . . Because these estates are severable, different owners may hold title to separate and distinct estates in the same land. The Pennsylvania rule permitting severance of the mineral estate for coal and other solid minerals applies with equal force to oil and gas. As with any estate in land, the owner of the mineral estate may convey his entire bundle of rights in fee or may grant a mere portion thereof via leasehold.

*Pa. Game Comm'n v. Seneca Res. Corp.*, 84 A.3d 1098, 1105 (Pa. Cmwlth. 2014) (citations and some punctuation omitted).

[4] A land warrant is "[a] document entitling a person to receive from the government a certain amount of land by following prescribed legal steps." BLACK'S LAW DICTIONARY 252, 956, 1234 (9th ed. 2009). This kind of document formed an integral part of

Pennsylvania's early land law[, which] developed from policies instituted by William Penn's sons in an attempt to encourage organized settlement and payment for the land. Generally, a person seeking to purchase land would submit an application to the Land Office. The secretary would issue a warrant, which described the land, the property adjoining the land, the purchaser, the purchase price, and the terms of sale. The issuance of the warrant triggered the surveyor general's responsibility for surveying the land, which would produce a survey map that identified important features on the land and adjoining properties and town and county boundaries, which helped to create cohesive maps of the area. Upon completion of the survey by the deputy surveyor, the surveyor general would verify the acreage, which included a six percent allowance for roads.

**(Footnote continued on next page…)**

4

Property and other nearby swaths of land subsequently fell into arrears, which led to Bradford County selling all of that land to Calvin H. McCauley, Jr. via tax sale in 1908. Final Adjudication, F.F. ¶¶11-13; R.R. at 352a-57a. This tax sale "washed" the Property's title and reunified its estates, such that McCauley consequently owned the entirety of the Property, both above and below ground. Final Adjudication, F.F. ¶13.[5] McCauley then conveyed the Property back to CPLC in 1910. *Id.*, F.F. ¶14; R.R. at 358a-61a.

> After the survey was returned, a patent would be issued providing clear title from the state or the proprietor (such as the Penn Family) to the original purchaser of the property.

*Herder Spring*, 143 A.3d at 360 n.3.

[5] Title washing was a valid aspect of our Commonwealth's property law at that time and came into play in instances where ownership rights to an unseated parcel's above- and below-ground estates had been separated, but that split had not been recorded and the land had consequently been assessed and taxed as an undivided unit. *Herder Spring*, 143 A.3d at 366-67. If the parcel was subsequently sold at tax sale, that sale would "wash" the land's title, such that any severance of subsurface and surface interests, as well as others' claims to title over any of the severed pieces, was swept away. *Id*; *see Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896) (internal citations and quotation marks omitted) ("In speaking of taxes on unseated lands, which were not a charge against the owner, . . . there was nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale. The taxes under which the sale was made in this case were on unseated lands, and there was no personal responsibility on the owner therefor. The land alone was liable.").

The parties are in agreement with the Board that the 1908 sale washed the Property's title. *See* Commission's Br. at 13; Commission's Reply Br. at 4-5; IDC's Br. at 15. However, that agreement only settles the title wash issue for *this* case, not for all matters relating to the Property. As cogently noted by the Commission,

> just because [it] and IDC stipulated that Proctor's interests were extinguished due to title wash[] does not mean that . . . Proctor[']s [putative successors in interest] (or other parties) are bound by that stipulation[.]
>
> . . . .

**(Footnote continued on next page…)**

CPLC held on to the Property for the next 10 years, until it divested itself in a manner which, nearly a century later, gave rise to the dispute that currently bedevils both the Commission and IDC. In 1920, CPLC sold 7,249.9 acres of land in Bradford County, encompassing both the Property and nearby acreage, to the Commonwealth for $18,722.25. Final Adjudication, F.F. ¶16; R.R. at 66a-70a. The deed memorializing this sale contained two clauses which are of particular import. The first (First Clause) stated that

> [t]his conveyance is made subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface on any or all of the lands described in each of the above mentioned parts or divisions [of the 1920 deed]; together with the right and privilege of ingress, egress and regress upon said lands for the purpose of prospecting for, or developing, working or removing the same, as fully as said minerals and mineral rights were excepted and reserved in deed dated October 27, 1894, from . . . Proctor [and Hill] to . . . Union . . . , recorded in the Office for recording deeds in Bradford County in deed book Vol. 205, page 436.

Final Adjudication, F.F. ¶17; R.R. at 69a-70a. The second (Second Clause) articulated that the conveyance was "[a]lso subject to all the reservations, exceptions, covenants and stipulations contained in said recited [1894] deed from . . . Proctor [and Hill] to . . . Union . . . and in deed from . . . Union . . . to [CPLC], above recited, dated May 25, 1903, of record as aforesaid in deed book Vol. 251,

> If one reads the deeds in the chain of title, and not just mere excerpts, it becomes abundantly clear the titles are complicated, at best. There are also intervening tax sales and . . . questions about the effect of those sales . . . which continue [to be litigated] in [f]ederal [c]ourt, despite the agreement of IDC and the [Commission] as to the [sales'] effect. Indeed, the "winner" of this case today [will] only earn the prize of future litigation in federal court and elsewhere.

Commission's Reply Br. at 2, 14.

6

page 520." R.R. at 70a.[6] Thereafter, in 1942, CPLC executed a quitclaim deed,[7] via which it "release[d] and quit claim[ed] to [the Keystone Tanning and Glue Company] any gas, oil and mineral rights, if any, which [CPLC] may have [had], but no greater right, title and interest of, in and to such gas, oil and mineral rights than [was then] held by [CPLC] in lands all located in Bradford County, [including the Property.]" *Id.* at 73a; *see* Final Adjudication, F.F. ¶21. These putatively separate interests were subsequently resold or transferred multiple times over the ensuing years, until IDC ultimately purchased them in 2000. Final Adjudication, F.F. ¶¶21-

---

[6] The Final Adjudication purports to include a *verbatim* reproduction of the Second Clause, but instead contains an inaccurate recitation that omits a small but critical part of that Clause. *Compare* Final Adjudication, F.F. ¶18 ("Also subject to all the reservations, exceptions, covenants and stipulations contained in said recited deed from Thomas E. Proctor, et al[.] to . . . Union . . . to [CPLC], above recited, dated May 25, 1903, of record as aforesaid in deed book Vol. 251, page 520"), *with* R.R. at 70a.

[7]     Quit-claim deeds, long known to the law, are used when a party wishes to sell or otherwise convey an interest he may think he has in land but does not wish to warrant his title. It does not purport to convey anything more than the interest of the grantor at the time of its execution. 16 Am.Jur. p. 560, sec. 219: *'The distinguishing characteristic of a quit-claim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself.'* (Emphasis added.) . . .

"One who receives a quit-claim deed to a property must proceed with caution if he seeks to possess himself of that property. By securing a quit-claim deed he has eliminated only one person who might bar his ingress to that property. A quit-claim deed contains no covenant of peaceful possession."

*In re Delinq. Tax by Elk Cnty. Tax Claim Bureau Held on Sept. 11, 2000 Parcel*, 793 A.2d 1025, 1030 (Pa. Cmwlth. 2002) (quoting *Greek Cath. Congregation of Borough of Olyphant v. Plummer*, 32 A.2d 299, 300 (Pa. 1943), and *Greek Cath. Congregation of Borough of Olyphant v. Plummer*, 12 A.2d 435, 437 (Pa. 1940)).

7

22, 24-33, 36; *see* R.R. at 76a-77a, 82a-84a, 86a-88a, 90a-92a, 94a-96a, 98a-103a, 105a-08a, 110a-13a, 115a-23a, 125a-35a, 158a-63a.[8]

As for the Commonwealth, its interest in the Property has been "owned, controlled[,] and managed" by the Commission since the Commonwealth purchased it in 1920. R.R. at 243a; *see* Final Adjudication, F.F. ¶39. In keeping with this, the Property is now part of State Game Lands Number 12, which is administered by the Commission. *Id.* In 2013, the Commission entered into an agreement with Chief, Radler 2000 Limited Partnership, and Enerplus Resources (USA) Corporation, entitled "Restricted Surface Use Cooperative Agreement for Exercise of Production Rights for Oil and Gas," which, in essence, constituted a five-year contract between the Commission and those companies, under which the companies were authorized to drill for oil and natural gas in State Game Lands Number 12 in exchange for making lease and royalty payments to the Commonwealth. R.R. at 171a-225a.

On April 30, 2018, IDC and Atlantic Hydrocarbon filed a petition for declaratory order (Declaratory Petition) with the Board, through which they asked the Board to rule that IDC, rather than the Commonwealth, owns all of the coal, minerals, natural gas, and oil that are present underneath the Property. R.R. at 2a-23a; *see also id.* at 24a-225a (Declaratory Petition exhibits).[9] The Board convened a

_____

[8] "On July 7, 2013, IDC leased its interest in the oil and gas underlying the . . . Property and other lands to Chief Exploration & Development, LLC ("Chief")[.] . . . Under the 2013 [l]ease, Chief was to pay a majority of the royalty interest to IDC and a small portion of the royalty interest to [Atlantic Hydrocarbon]." Final Adjudication, F.F. ¶¶37-38; *see* R.R. at 165a-69a, 295a (lease agreement and relevant portion of hearing transcript).

[9] In 1929, the General Assembly created the Board to hear disputes over land held or claimed by the Commonwealth.[] Through Section 1207 of [T]he Administrative Code of 1929[, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 337], the General Assembly conferred upon the Board broad authority over such disputes,

**(Footnote continued on next page…)**

8

hearing regarding the Declaratory Petition on June 16, 2020, and, after considering the arguments and evidence presented by the parties, issued its Final Adjudication on April 15, 2021. Therein, the Board interpreted the 1920 deed's First Clause as having incorporated by reference the language of the subsurface rights reservation from the 1894 deed, thereby

> giv[ing] the applicable provision of the recorded 1894 [d]eed the same force and effect as if it had been part of the 1920 [d]eed.
> . . . .
> By stating that the 1920 [d]eed is subject to mineral rights and then incorporating by reference the exception of mineral rights of the 1894 [d]eed that otherwise was no longer in effect, CPLC made clear[] that it did not intend to — and by this language did not — convey to the Commonwealth the mineral rights as had been excepted in the 1894 [d]eed. CPLC thus expressly reserved to itself all the minerals etc. in the lands described along with appropriate easements. No mineral rights were conveyed to the Commonwealth by the 1920 [d]eed.

Final Adjudication, Discussion at 13-14 (footnote omitted). In addition, the Board reasoned that the 1920 deed's First Clause was not simply boilerplate language that served as a general warranty disclaimer provision; according to the Board, "[b]y incorporating by reference the mineral rights exception of the 1894 [d]eed [through the First Clause,] but not doing so with respect to similar provisions of the 1903 [d]eed [through the Second Clause], CPLC demonstrated that these provisions were to be treated differently." *Id.*, Discussion at 14. As a consequence, the 1920 deed

---

including "exclusive original jurisdiction over any claims involving title to land occupied or claimed by the Commonwealth, such as claims in actions to quiet title." *Krulac v. Pa. Game Comm'n*, 702 A.2d 621, 623 (Pa. Cmwlth. 1997) (emphasis in original).

*Beishline v. Dep't of Env't Prot.*, 234 A.3d 878, 880 (Pa. Cmwlth. 2020) (footnotes and quotation marks omitted).

9

only conveyed the Property's "surface rights" to the Commonwealth and served to reserve the Property's "mineral rights" for CPLC, which had not divested itself of those rights until 1942, when it deeded them to the Keystone Tanning and Glue Company. *Id.* Accordingly, the Board concluded "that IDC and not the Commonwealth is the owner of the mineral rights of the . . . Property, in which [Atlantic Hydrocarbon] holds a royalty interest." *Id.*, Conclusions of Law ¶2; *see id.*, Discussion at 14 ("[A]s the Commonwealth received no mineral rights through the 1920 Deed, IDC is the owner of all mineral rights in the . . . Property.").

This appeal to our Court followed shortly thereafter.

## II. Discussion

The Commission presents arguments for our consideration that all effectively boil down to a single contention, *i.e.*, the Board incorrectly read the 1920 deed's First Clause as reserving the Property's mineral rights for CPLC, rather than as a warranty disclaimer provision, and erroneously concluded on that basis that IDC, rather than the Commonwealth, owns the natural resources underneath the Property. Commission's Br. at 7-24; Commission's Reply Br. at 2-16. In general, our standard of review regarding Board adjudications is limited to determining whether the Board violated a petitioner's constitutional rights or committed an error of law, as well as whether the Board's findings of fact are supported by substantial evidence. *Beishline*, 234 A.3d at 884 n.8; 2 Pa. C.S. § 704. More particularly, interpretation of a deed's language, like that of any contract, is a question of law and, thus, our standard of review regarding the Board's reading of the 1920 deed is *de novo* and our scope of review is plenary. *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009); *Joiner v. Sw. Cent. Rural Elec. Co-op. Corp.*, 786 A.2d 349, 352 (Pa. Cmwlth. 2001).

> In interpreting this [type of] instrument[,] certain rules of construction are applicable: (1) the nature and quantity of

10

the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud, accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words . . . (2) effect must be given to *all* the language of the instrument and no part shall be rejected if it can be given a meaning . . . ; (3) if a doubt arises concerning the interpretation of the instrument[,] it will be resolved against the party who prepared it . . . ; (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored . . . ; [and] (5) to ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed[.]

*Brookbank v. Benedum-Trees Oil Co.*, 131 A.2d 103, 107 n.6 (Pa. 1957) (emphasis in original, internal citations and some punctuation omitted).

Both the First Clause and Second Clause expressly state that CPLC's conveyance to the Commonwealth was made "subject to" certain conditions. *See* Final Adjudication, F.F. ¶¶17-18; R.R. at 69a-70a. This phrase has a specific meaning when used in property deeds, which the Superior Court aptly explained in *Burns v. Baumgardner*:[10]

"[T]he fact that a conveyance is made 'subject to' restrictions set forth in some other deed or instrument referred to will not, without more, make the restrictions applicable to the property conveyed, if in fact the restrictions do not otherwise apply thereto. If the 'subject to' language of the instrument in question refers to restrictions which in fact do not exist at all, it does not operate to impose the supposed restrictions on the granted land." 20 Am. Jur. 2d Covenants, Conditions, and Restrictions, § 169, at 728. *See also*[] *De Sanno v. Earle*, . . . 117 A. 200 ([Pa.] 1922); *Smith v. Second Church of*

---

[10] "In general, Superior Court decisions are not binding on this Court, but they offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 551 (Pa. Cmwlth. 2018).

11

> *Christ, Scientist*, . . . 351 P.2d 1104 ([Ariz.] 1960); *Procacci v. Zacco*, . . . 324 So.2d 180 ([Fla. App.] 1975); *Wiley v. Schorr*, . . . 594 S.W.2d 484 ([Tex. Civ. App.] 1979); Annotation, 84 A.L.R.2d 780 (1962).

449 A.2d 590, 593 (Pa. Super. 1982).

> Although such reference [*i.e.*, 'subject to'] does not impose new restrictions on the land, it nonetheless serves a very necessary and desirable purpose for the grantor. When property is conveyed by warranty deeds . . . it is in the interest of the grantors that the conveyance be made subject to every restriction or encumbrance which not only does apply to such property but also may apply. The inclusion of restrictions in the 'subject to' clause may thus express a wise precaution on the part of the grantor (*cf. Donahoe v. Turner*, . . . 90 N.E. 549 [(Mass. 1910)]). It would indeed be foolhardy for a grantor who is delivering a warranty deed to fail to refer to a restriction which may at some time in the future be held to apply to his property, merely to avoid the criticism of excess wordiness. Thus, it is not unusual for conveyances to be made subject to all recorded covenants, easements and restrictions, without specific enumeration, and it would be inappropriate, to say the least, to infer restrictions because it may subsequently turn out that none then applied to the property.

*Id.* (quoting *Smith*, 351 P.2d at 1109). Therefore, in the absence of additional deed language that contextualizes "subject to" as imposing some sort of restriction upon the property rights acquired by the grantee, or reserving for the grantor some portion of those rights, this phrase can show the grantor's intent regarding the scope of the warranty they have given to the grantee, but "[cannot] create new restrictions or expand existing restrictions." *Id.*

Reading these clauses together, we conclude that the First Clause reserved for CPLC ownership over the Property's coal, minerals, natural gas, and oil. To reiterate, the First Clause states that

> [CPLC's] conveyance [to the Commonwealth] is made subject to all the minerals, coal, oil, gas or petroleum

12

> found now or hereafter on, or under the surface on any or all of the lands described in each of the above mentioned parts or divisions; together with the right and privilege of ingress, egress and regress upon said lands for the purpose of prospecting for, or developing, working or removing the same, as fully as said minerals and mineral rights were excepted and reserved in deed dated October 27, 1894, from . . . Proctor [and Hill] to . . . Union . . . , recorded in the Office for recording deeds in Bradford County in deed book Vol. 205, page 436.

Final Adjudication, F.F. ¶17; R.R. at 69a-70a. The phrase "as fully as" is key, in that it transforms the entire clause from one which would operate as a warranty to one which limited the scope of the property transfer memorialized by the 1920 deed. Properly contextualized, the language of the First Clause shows an intent to reserve CPLC's ownership of "all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface [of the Property,]" and establishes that this reservation was equally as broad as Proctor and Hill's reservation via the 1894 deed of the Property's "minerals and mineral rights." *See* R.R. at 42a, 69a-70a. In other words, just as Proctor and Hill had reserved for themselves "all" of the Property's mineral rights, so too did CPLC reserve for itself ownership over all of the Property's coal, minerals, natural gas, and oil.[11]

---

[11] We note that there is a longstanding canon of deed interpretation in Pennsylvania known as the *Dunham* Rule, which was created by our Supreme Court in *Dunham v. Kirkpatrick*, 12 W.N.C. 217 (Pa. 1882). This rule establishes that "absent the terms 'oil' or 'natural gas' being included within a reservation for mineral rights within a private deed, oil or natural gas simply are not encompassed within the reservation without clear and convincing parol evidence produced by the proponent of the reservation to the contrary." *Butler v. Charles Powers Est. ex rel. Warren*, 65 A.3d 885, 896 (Pa. 2013). The Commission appears to have made a brief, oblique gesture towards this Rule, but failed to develop an argument on that basis in any substantive way. *See* Commission's Br. at 11. Accordingly, to the extent that the Commission could have argued that the First Clause's reference to "minerals and mineral rights" did not establish an intent to reserve CPLC's ownership over the Property's coal, minerals, natural gas, and oil, it has waived its ability to do so. *See Wirth v. Com.*, 95 A.3d 822, 837 (Pa. 2014) (quoting *Com. v. Johnson*, 985 A.2d 915,
**(Footnote continued on next page…)**

The language used in the Second Clause reinforces our conclusion that the First Clause excepted these interests from the 1920 deed and did not operate as a warranty provision. As already mentioned, the Second Clause states that the conveyance from CPLC to the Commonwealth was "[a]lso subject to all the reservations, exceptions, covenants and stipulations contained in said recited [1894] deed from . . . Proctor [and Hill] to . . . Union . . . and in deed from . . . Union . . . to [CPLC], above recited, dated May 25, 1903, of record as aforesaid in deed book Vol. 251, page 520." Final Adjudication, F.F. ¶18; R.R. at 70a. The Second Clause consequently warranted the 1920 deed against conditions imposed by the 1894 deed and/or the 1903 deed, due to the Second Clause's use of "subject to" in conjunction with the absence of verbiage that restricted the Commonwealth's ownership rights. In light of this, the First Clause cannot *also* act as a warranty provision, for interpreting it as such would render either it or the Second Clause redundant and turn the First Clause's more specific language (as compared to the Second Clause) into spare, inoperative verbiage. Doing so would thus contravene the requirement that "effect must be given to *all* the language of [a deed] instrument and no part shall be rejected if it can be given a meaning[.]" *Brookbank*, 131 A.2d at 107 n.6 (emphasis in original).

### III. Conclusion

In light of the foregoing, we conclude that CPLC did not transfer ownership of the Property's coal, minerals, natural gas, and oil to the Commonwealth via the

---

924 (Pa. 2009)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of [an appellate court] to formulate [an a]ppellant's arguments for [him]."); *Rapid Pallet v. Unemployment Comp. Bd. of Rev.*, 707 A.2d 636, 638 (Pa. Cmwlth. 1998) ("Arguments not properly developed in a brief will be deemed waived by this Court."); Pa. R.A.P. 2119(a).

1920 deed and, consequently, that IDC is the current owner of those natural resources, to the extent any are present below the Property's surface.[12] Accordingly, we affirm the Board's Final Adjudication.

_____
ELLEN CEISLER, Judge

---

[12] Given the language used in the First Clause, IDC could conceivably assert an ownership claim to *all* of the Property's coal, minerals, natural gas, or oil, regardless of whether those resources are on the surface or beneath the ground. *See* R.R. at 70a ("[CPLC's] conveyance [to the Commonwealth] is made subject to all the minerals, coal, oil, gas or petroleum found now or hereafter on, or under the surface on any or all of the lands described in each of the above mentioned parts or divisions [of the 1920 deed.]"). However, our holding here is limited in scope to the relief IDC requested from the Board. As IDC only asked the Board to determine that IDC owns the Property's subterranean deposits of coal, minerals, natural gas, and oil, neither this opinion nor the Final Adjudication can or should be understood as addressing or resolving any claim to the Property's surface rights.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania,   :
Pennsylvania Game Commission,   :
              Petitioner   :
   :
      v.              :  No. 497 C.D. 2021
   :
International Development   :
Corporation and Atlantic   :
Hydrocarbon (Board of   :
Property),   :
           Respondents   :

# **O R D E R**

AND NOW, this 4th day of March, 2022, it is hereby ORDERED that the Board of Property's final adjudication and order, dated April 15, 2021, is AFFIRMED.

 

                     _____
                     ELLEN CEISLER, Judge